**SUN OIL COMPANY OF
PENNSYLVANIA**

v.

**LOCAL 8–901, OIL, CHEMICAL, AND
ATOMIC WORKERS' INTERNA-
TIONAL UNION, AFL–CIO.**

**Civ. A. No. 75–1322.**

United States District Court,
E. D. Pennsylvania.

Nov. 5, 1976.

---

Robert A. Webster, St. Davids, Pa., John A. McGuinn, Farmer, Shibley, McGuinn & Flood, Washington, D. C., for plaintiff.

Paula R. Markowitz, Markowitz & Kirschner, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This is a labor arbitration case which presents the question whether to vacate or enforce an arbitrator's award ordering the Sun Oil Company (the company) to alter a work assignment that it had made at its Marcus Hook, Pa. refinery over protest of Oil, Chemical and Atomic Workers, Local 8–901, AFL–CIO (the union).[1] The dispute which led to the arbitrator's award emanated from the decision of the company to have certain of its operating division personnel, known as "hosewatchers and dockworkers," perform gas testing functions which previously had been performed exclusively by personnel in a job classification known as "Gas Testers." The original grievance, filed by a chief hosewatcher in the company's dock department, alleged that the work assignment violated Article VIII.M. of the collective bargaining agreement to which the company and the union were parties because:

> Dock Personnel [are] being commandeered to perform gas testing duties with which they are totally unfamiliar, [and this] places an undue hardship on the men performing these duties. The use of Dock Personnel to use gas tester equipment causes an unsafe condition within the Refinery for themselves and other employees.

1. The company filed suit seeking to vacate the award. The union filed a counterclaim seeking enforcement of the same award. The matter is before us on the cross motions for summary judgment of the union and the company.

2. The provisions of the agreement which the company asserts are relevant to its management functions contentions are the following:

ARTICLE I
FUNCTIONS OF MANAGEMENT
A. The Union expressly recognizes that the Company has the exclusive responsibility for

Article VIII.M. of the agreement provides:

> No employee shall be required to perform services that may endanger his physical safety beyond the usual and normal requirements of his job.

After the grievance passed through the three-step grievance procedure without resolution, the company and the union, in accordance with their agreement, submitted it to a mutually selected arbitrator, Arnold Zack. The parties stipulated that the question for the arbitrator to decide was:

> Does the use of gas tester equipment by the dockers and hosewatchmen violate Article VII.M. or any other pertinent provision of the parties' agreement? What shall be the remedy, if any?

After three days of hearings, which included the testimony of the grievant, an industrial hygienist, and an experienced gas tester for the union, and several refinery supervisors for the company, and the review of briefs submitted by the parties, the arbitrator issued his award, accompanied by a 13 page opinion. The award was as follows:

> The use of Gas Tester equipment by Dockers and Hosewatchmen does violate Article VIII M of the parties' agreement. The work shall be reassigned to Gas Testers.

The company contends that the arbitrator's decision must be vacated for several reasons. First, the company argues that the award does not in any rational way draw its essence from the collective bargaining agreement because work assignments fall within the management functions articles of the agreement and therefore are the exclusive prerogative of the company.[2] In addition, the company main-

the management, operation and maintenance of its facilities, and in furtherance thereof, has the right to select and hire, direct the work force, schedule work, determine what work is to be done, what is to be produced and by what methods and means, to determine the size of the work force, to locate or remove any portion of the facilities, to abandon any operation, to arrange for work to be done by other refineries of the Company; and such shall not be subject to grievance and arbitration.

tains that if the arbitrator could properly reverse its decision to assign gas testing duties to dock department personnel, he could not order that the work be reassigned to gas testers because of the management functions provisions.

The company's second major argument is that the arbitrator's award is irrational because there was no evidence whatsoever that dock employees were required to perform services which might endanger their physical safety beyond the usual and normal requirements of their job. This argument is two-pronged. First, the company argues that because once the gas testing duties were assigned to dock personnel, these duties became a part of the usual and normal requirements of their jobs, hence the gas testing duties could not endanger the employees' physical safety beyond the usual requirements of their jobs of which the duties were now a part. The second aspect of the argument, and the most troublesome point in the case, is the contention that there is no evidence in any event that the addition of the gas testing duties increased the danger to the dockworkers' and hosewatchmen's physical safety. Needless to say, the Union has vigorously countered each and everyone of the company's arguments.

Given the extremely limited scope of review of labor arbitration awards, we have no difficulty in rejecting the company's arguments regarding the management functions provisions of the agreement, since they merely raise issues of interpretation of

B. In exercising its other management responsibilities, the Company shall be subject to the express provisions of this Agreement, including the grievance and arbitration procedures. These responsibilities shall include (by way of example and not limitation) the right to promote, demote, lay off, recall, discipline, or discharge employees for just cause, to determine the qualifications of employees to perform work, to arrange for work to be done by outside contractors, and the right to establish and enforce reasonable. rules of conduct to assure discipline and efficient operations.

ARTICLE II
EMPLOYEE DUTIES AND
RESPONSIBILITIES

the collective bargaining agreement which were rationally resolved by the arbitrator in favor of the union. And, for the reasons which follow in considerable detail, although the question is an extremely close one, we also reject the company's contention that the award is irrational for lack of any evidence to support it. Accordingly, we will deny plaintiff's motion for summary judgment, grant defendant's motion, and order enforcement of the arbitrator's award.

## II. Scope of Review

█ The role of a district court in reviewing an arbitrator's award is a sharply limited one which was carefully circumscribed by the Supreme Court in the famous *Steelworkers* trilogy. *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *United Steelworkers v. Warrior & Gulf Navigator Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). In *Enterprise Wheel,* the Court stated that an arbitrator's award "is legitimate only so long as it draws its essence from the collective bargaining agreement." The Court also articulated in that opinion the basic reasons why arbitrator's awards are subject to only limited review:

When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his

A. Each employee will be assigned work by a recognized Supervisor and will be responsible for proper performance of duties to the party making the assignment.
B. Each employee will observe recognized safety rules and precautions, customary working regulations, and will diligently fulfill the requirements of ·his job.

·        ·        ·        ·

ARTICLE XVII
REFINERY JOB PROGRESSION
PROCEDURE

·        ·        ·        ·

B. It is a responsibility incumbent on the Company to determine, schedule, and assign the work to be performed.

informed judgment to bear in order to reach a fair solution of a problem. . . .

It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

363 U.S. at 597, 599, 80 S.Ct. at 1361–1362.

The Third Circuit elaborated on the standard of review and the rationale behind its limited scope in the leading case of *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123 (3d Cir. 1969). As to the rationale, the court stated:

It is not within the province of a reviewing court to agree or to disagree with the conclusion reached or with the specific reasoning employed. Our sole function is to decide whether the arbitrator's interpretation met the test which the courts must apply in exercising the limited function of review in cases arising from labor arbitration.

405 F.2d at 1132.

The test of whether a labor arbitrator's award draws its essence from the collective bargaining agreement, as stated in *Ludwig Honold,* turns upon whether

the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention; only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the

shop, may a reviewing court disturb the award.

405 F.2d at 1128. The Third Circuit has also held that "[a]n arbitrator is not required to list his reasons for the award [and that], an ambiguity in his opinion [does not] support an inference that he exceeded his authority." *NF&M Corp. v. United Steelworkers,* 524 F.2d 756, 759 (3d Cir. 1975).[3]

### III. *The Arbitration Record*[4]

The plaintiff, for many years, maintained a job classification known as "Gas Tester" in its Marcus Hook, Pa. refinery. The general function of the Gas Tester was to go into the various departments of the plaintiff's operating division, such as the dock department, and with the use of approximately five types of testing equipment, to ascertain whether tanks or other pieces of equipment were sufficiently free from noxious or explosive gases and fumes to permit operating personnel, such as dockworkers, to enter or work on them without the need for protective equipment.

Prior to a work stoppage in 1973, plaintiff employed a total of 20 testers. By the end of the work stoppage, only 11 gas testers remained, the others having voluntarily retired. Rather than hire new gas testers or transfer workers from some other job classification to that of Gas Tester, the plaintiff decided to train all operating dock personnel to perform gas testing duties. By June 1975, at least 525 operating employees had been given a 2½ hour course on the operation of the gas testing equipment and were practicing with the equipment at their unit work locations. The grievant,

---

**3.** Other circuits have adopted similar though verbally discrete formulations. For instance, in *Holly Sugar Corp. v. Distilling, Rectifying, Wine & Allied Workers Int'l,* 412 F.2d 899 (9th Cir. 1969), it was held that the courts "must resist 'the temptation to "reason out" a la judges the arbiter's award to see if it passes muster.' . . . [I]f, on its face, the award represents a *plausible interpretation* of the contract in the context of the parties' conduct, judicial inquiry ceases and the award must be affirmed." 412 F.2d at 903. (emphasis added)

The First Circuit highlighted the exceedingly narrow scope of judicial review of labor arbi-

tration awards in *I. U. E. v. Peerless Pressed Metal Corp.,* 489 F.2d 768 (1st Cir. 1973) when it stated that the only question before the district court was whether the arbitrator's construction of the contract was " 'so palpably faulty that no judge, or group of judges, could ever conceivably have made such a ruling.' "

**4.** The record before us on summary judgment includes the transcript of the testimony at the hearing totalling some 486 pages, two joint exhibits, five union exhibits, eleven company exhibits, and the briefs submitted to the arbitrator, as well as the arbitrator's opinion.

who was classified as a chief hosewatcher, filed the grievance referred to above, after being informed that he would be trained to operate gas testing equipment.

The union presented four witnesses before the arbitrator, including the grievant, an experienced gas tester, and an industrial hygienist. The latter gave expert testimony. A major thrust of the union's presentation was that an oil refinery dock is a potentially dangerous place because of the presence of fumes. One witness testified about the death from inhalation of fumes of a worker who entered a tank without having had a gas test taken. Gas testing, the witness emphasized, is an essential safety feature of refinery operations which reduces the risk of injury, including death, from explosions and the inhalation of noxious fumes.

The union witnesses explained the complexity and sophistication of gas testing equipment.[5] They also discoursed upon the skill necessary: (1) to recognize malfunctions of the equipment; (2) to determine the type of test that has to be taken in a particular situation; and (3) to "smell" out dangerous situations in the refinery. One witness recalled that the incorrect reading of gas testing equipment on one occasion by a trainee led to a fire, although no one was injured. There was testimony which vividly demonstrated that, not unlike the situation of a physician, only years of experience enabled a gas tester to diagnose from among a myriad of cross-indications, the real nature of a potential safety hazard. (Arb. N.T. 142–145. Testimony of Harold Wilson). There also was testimony about the limited nature of the company training program in gas testing for operating personnel in contrast to the extensive program of training (including a lengthy apprenticeship) for the full-time gas testers.

The union's expert industrial hygienist expressed the opinion that it was less safe to have operating personnel rather than full-time gas testers perform the tests because the operating personnel had a conflict between their interest in performing properly the necessary safety tests and their interest in production which perforce (under pressure) sometimes had to be expedited. The gas testing could slow down the production work or quite possibly would require the cessation of production operations completely. In the expert's view, the operating personnel's interest in completing as much production work as possible would win out and he opined that the workers would, because of this conflict, give inadequate attention to gas testing. In any event, he noted the existence of the conflict and testified that, as a matter of fundamental industrial hygiene principles, it was undesirable to consolidate the safety testing and production functions.

Finally, there was testimony regarding the possible long term toxic effects of exposure to some of the gases present in the refinery, particularly benzene. The industrial hygienist stated his belief that gas testers were possibly exposed to those gases to a greater extent than dock personnel. He stated:

I mean a tester could go from one place to another that has fairly high concentrations. He is called in every time. He may be more exposed more continuously sometimes than the actual operator.

Notes of testimony, at 227.

Six witnesses, all of whom were refinery employees, testified on behalf of the company. They emphasized that the company training program adequately prepared the dockworkers to perform gas testing and in fact was more extensive than the training originally received by gas testers, and that

---

5. In recent years gas testers have used the following equipment to carry out tests for the following:

| EQUIPMENT | TEST FOR |
| --- | --- |
| JW Sniffer | Combustible gases |
| Hayes Orsat | $O_2$, $CO_2$ |
| Fyrite | $O_2$, $CO_2$ |

| EQUIPMENT | TEST FOR |
| --- | --- |
| Bendix gun | Benzene, CO, $SO_2$, $H_2S$, Toluene, Ammonia, Xylene, Ethyl Mercaptan, Methyl Ethyl Ketone |
| Burrell | $O_2$, $CO_2$, CO |

the equipment was not very complicated. One witness explained that the tests were performed with the use of long hoses so that the tester did not have to physically enter the area being tested. Thus, the gas tester was not exposed to the gases to any greater extent than operating personnel. One of the company's witnesses also expressed the opinion, in contrast to that of the industrial hygienist, that the dockworker who had to remain near the area tested or actually work in a tank which had been tested was more likely to carefully and properly take the necessary tests than a full-time gas tester who may move to another part of the refinery after finishing the test and thus not remain exposed to the hazards of the tested environment. Also, the dockworker who spends his full day in the area, is more likely to know where and when to test, and what tests to perform, because he is more familiar than a gas tester with his work area.

The arbitrator, in an extensive written opinion, reviewed the details of the dispute, the provisions of the agreement, and the evidence presented, and made credibility determinations and findings. He initially considered the company's contentions regarding the management functions provisions, stating, "Article I of the agreement . . . retains to management the right to determine the qualifications of employees to perform work," as well as the right to "establish and enforce reasonable rules of conduct to assure . . . efficient operations." He noted, however, that both of these general rights are "subject to the express provisions of the parties' agreement," including Article VIII.M., Arbitrator's Opinion (hereinafter "A.O."), at 9.

The arbitrator then turned to the question of whether Article VIII.M. had been violated. He first noted that the classifications of docker and hosewatchman had for many years prior to 1973 excluded the requirement of gas testing of the areas in which they were assigned to work, and that, under that arrangement, the employees undertook work in areas only where there had been assurance provided either through a supervisor's determination that a gas test was not needed or as a consequence of a gas tester's finding that the area was safe to work in with or without protective equipment. The arbitrator then observed (A.O. at 9–11):

> The usual and normal safety requirements of the job were thus minimal, since the determination of whether or not a job was safe had been made prior to Dockers and Hosewatchmen working on it through the determination of supervisors using experienced Gas Testers. Thus, because the Gas Testers determined whether or not an area was safe, they themselves assumed any physical dangers to their own safety by such testing as a usual and normal requirement of their jobs to assure that the danger to physical safety of Dockers and Hosewatchmen was eliminated or at least reduced to the minimum that became the usual and normal requirements of the latters' job.

.  .  .  .  .

> Even if the Dockers and Hosewatchmen were as thoroughly trained and experienced as the former Gas Testers had been, it would therefore follow that the assumption of the gas testing duties with the normal dangers inherent therein, in addition to their regular responsibilities, would raise the danger to physical safety of Dockers and Hosewatchmen beyond the previous standard of the usual and normal requirements of their job.

However, the arbitrator did not stop there, finding that the dockers and hosewatchmen did not have the same training and experience as the gas testers. Indeed, the increased danger to the physical safety of Dockers and Hosewatchmen was even greater than that which could be assumed from their taking over the testing work with unquestioned qualification. Although both Gas Testers and operating personnel were presumably equally adept at learning how to operate the various testing equipment, it is clear that proper job performance encompasses

more than that simple skill. The evidence shows that Gas Testers underwent longer periods of training on and experience with the selection, use, care, and repair of the equipment; that they worked with testing equipment of various types on a full time basis throughout the refinery under a diverse set of environmental conditions; and that they underwent this training and experience development first in tandem with a senior Gas Tester, and under overall guidance of the more experienced Testers. In addition, their experience with varying problems increased their capability to determine which tests to use, which equipment is best suited for the tests to be taken, and whether the equipment was properly functioning to peak efficiency, or whether it needed adjustment or repair to improve its accuracy. Also their exposure to test situations heightened their sensitivity to odors as a failsafe, even if readings were passable, to assure sensitivity to the problems to be tested for.

The Dockers and Hosewatchmen, on the other hand, although presumably well trained in the operation of the equipment, have not had that diversified, yet constant contact with testing problems. They have experience within limited areas of the refinery, and with limited gas testing problems.

A.O. at 10–11. Arbitrator Zack also credited the testimony of the union's industrial hygienist by finding an inherent conflict created by requiring operating personnel to perform gas testing in addition to their regular duties. The arbitrator concluded that dockers and hosewatchmen, by the addition of the requirement that they perform gas tests, are subjected to dangers to their physical safety which are beyond the previous usual and normal requirements of their jobs. In terms of remedy, the arbitrator determined that the dockworkers and hosewatchmen should be divested of gas testing responsibilities and that those duties be assigned to employees specializing in gas testing, and he suggested the creation of new gas tester jobs.

## IV. *Discussion*

### A. *The Alleged Conflict between Article VIII.M. and the Management Functions Provisions*

The company contends that the arbitrator's award cannot in any rational way be derived from the agreement because his award affects work assignments which are within the exclusive prerogative of management. The arbitrator, as we have noted, concluded that the general rights expressed in the management functions provisions were subject to the express provisions of the rest of the agreement, including Article VIII.M. and thus rejected the management functions argument.

The only management decisions which the agreement states shall not be subject to grievance and arbitration are those mentioned in Article I.(A), the "Functions of Management" Clause. The other clauses which the company contends give them exclusive control over work assignment are Article II, the "Employees Risks and Responsibilities" clause, and Article VXIII.B., the "Refinery Job Progression" clause, but those clauses do not contain the express prohibition of arbitration found in Article I.(A). Moreover, Article I.(A) does not specifically mention work assignments. Although work assignments could arguably fall within one or more of the general rights given exclusively to the company by that provision, the arbitrator obviously concluded otherwise, and we cannot say that this conclusion was irrational. *Enterprise Wheel,* p. 5 *supra,* makes clear the latitude accorded the arbitrator's role in contract construction. Work assignments are rather specifically mentioned in the other provisions relied on by the company, and the arbitrator could therefore have rationally decided that when the parties intended to refer to work assignments, they did so specifically. Therefore, since work assignments were not referred to specifically in Article I.(A), the arbitrator could rationally have determined that the parties did not intend to include work assignments among the exclusive rights of the company. However, and perhaps more significantly, the

arbitrator could also have rationally determined that Article VIII.M. would be rendered nugatory if Article I.(A) were read to prevent arbitral review of work assignments where the grievance claim was that the work assignment allegedly violated another express provision of the agreement. Rather than emasculate Article VIII.M., the arbitrator interpreted the agreement to allow arbitration and the award of relief affecting work assignments in such situations, despite the prohibition of Article I.(A). We find this judgment to be properly within his charter.

■ The company strongly protests the nature of the relief awarded, i. e., reassignment of the work to gas testers. The company argues that the only type of acceptable remedy that the arbitrator could have mandated was in the nature of ordering the company to begin a more extensive gas testing training program for the operating personnel. Although we note that the (industrial hygiene) conflict problem would not have been solved by employing such a remedy, we accept the notion that there may have been other remedies within the arbitrator's power. Indeed, the arbitrator recognized that Article I.(A) placed some limitations on his remedial power. He stated:

> [I]t is within the authority of the employer to determine how many Gas Testers it will utilize, and the sources from which they will be obtained, whether from the laboratory progression, from the ranks of Dockers and Hosewatchmen, or elsewhere.

However, what is at issue is his conclusion that he was not precluded from ordering reassignment, given that work assignments are not specifically mentioned in Article I.(A) and that to do otherwise would emasculate Article VIII.M. It has been settled since *Enterprise Wheel, supra,* that the arbitrator has full authority to interpret the collective bargaining agreement. Because we cannot say that the arbitrator's interpretation of the agreement was irrational or that it did not draw its essence there-

from, the company's management functions argument must be rejected.

B. *Was There any Evidence to Support the Arbitrator's Award?*

■ It is the law in this circuit, *see NF&M Corporation v. United Steelworkers of America,* 524 F.2d 756, 760 (3d Cir. 1975); *H.K. Porter Co., Inc. v. United Saw, File & Steel Products Workers of America,* 333 F.2d 596 (3d Cir. 1964), that where there is *no* evidence to support the arbitrator's award, it is deemed irrational and must be set aside. The company contends that there is no evidence that supports the arbitrator's finding that the company, by requiring dockworkers and hosewatchmen to perform gas testing duties, violated Article VIII.M. of the collective bargaining agreement because the gas testing duties endangered their physical safety beyond the normal requirements of their job.

■ The company's first "no evidence" contention need not detain us long. It is that once the gas testing duties were assigned to the dock personnel, these duties became a part of the "usual and normal requirements of their jobs" and that since there was no evidence regarding any assignment of additional duties other than gas testing, it follows that there was no evidence to support the arbitrator's decision that Article VIII.M. was violated.

The company argues that Article VIII.M. was included in the agreement to cover situations where a supervisor orders a worker on one particular occasion to perform a dangerous task which is not part of his regular job. It was not intended, it argues, to reach permanent changes in employee duties. The arbitrator obviously interpreted Article VIII.M. much more broadly. The operative language of the provision is "to perform services." Thus, the arbitrator regarded gas testing duties as "services" to be performed. We do not find this interpretation of "services" to be unreasonable or irrational. Also, the arbitrator's implicit conclusion that newly assigned duties do not immediately become usual and normal requirements of a pre-existing job is not

irrational. Undoubtedly, the company could establish a new job classification of dockworker-gas tester and offer that position to its present workers or hire new workers to fill the position in the new classification without violating a broadly construed Article VIII.M., but that is not what was done here.

It is the company's principal "no evidence contention," i. e., the contention that there was no evidence to support the arbitrator's conclusion that gas testing is more dangerous than the usual and normal requirements of the jobs of the dockworkers, which gives us more trouble. Indeed, we were sufficiently troubled by the question whether there was any such evidence (and it takes precious little to sustain an award) that we requested from the parties and received a set of supplementary briefs and a set of supplementary letters on these issues. The framing of our request was a function of our inability to determine with certainty the basis of the arbitrator's conclusion of increased danger. It is important to air the nature of our uncertainty, and we do so by rescribing the pertinent portions of our letter of April 14, 1976, to all counsel, wherein we asked counsel to submit supplementary briefs on the following matters:

1. Precise identification of the evidence in the record before the Arbitrator which supports your position on the following:

(a) whether the risks of physical injury involved in the mechanical operation of gas testing equipment in an untested area by Dockers and Hosewatchmen are greater than the risks of physical injury involved in the jobs of these workers, as the jobs were constituted prior to the reassignment of gas testing duties;

(b) whether the general work environment in the refinery, and hence the danger to all workers, is more dangerous when the Dockers and Hosewatchmen perform the gas testing than when it is done by gas testers.

2. Is Arbitrator Zack's determination that there was a violation of Article VIII–M based on his findings on 1(a) of this letter, 1(b), or both 1(a) and 1(b) or on findings on some other factual issue? If so, what is it, and what evidence is addressed to that issue?

3. Could the Arbitrator properly rely on the factual determinations you have identified in response to Question 2 in resolving the question whether there was a violation of Article VIII–M? In responding to this question, your comments on the possible interpretations of the language of Article VIII–M will, of course, be pertinent.

4. If you have not already reached this question, is the Arbitrator's award supportable based on a finding on 1(b) alone?

The parties, in their response to our letter, agreed that the arbitrator's award rested upon the issue posed in our question 1(a).[6] Our concern about that aspect of the matter arose from our perception that much of the union's evidence seemed addressed instead to the issues involved in our query 1(b) relating to general work environment and danger to *all* workers (including, but not limited to dockworkers and hosewatchmen). Such a reading might in turn implicate Article VIII.L. of the collective bargaining agreement which reads in part:

Company shall continue to make reasonable provisions for the safety and health of its employees at the plant  .  .  ..

6. Counsel for the union, however, strongly remonstrated against our "looking behind the Arbitrator's award." Counsel adverted to *Enterprise Wheel, supra*:

Arbitrators have no obligation to the court to give their reasons for an award. To require opinions free of ambiguity may lead arbitrators to play it safe by writing no supporting opinions.

363 U.S. at 598, 80 S.Ct. at 1361. She also reminded us of our words in *Adelphia Nursing and Convalescent Home v. Service Employees Local 252*, 367 F.Supp. 760, 764 (E.D.Pa.1973):

[U]nder *Ludwig Honold* it is the *award* rather than the conclusion or the specific reasoning employed that a court must review.

The testimony presented by the union did not deal with the risks, if any, involved in the mechanical operation of the gas testing equipment. There was but little testimony regarding the duties of hosewatchmen or dockworkers, and none of it seemed specifically directed at the dangers inherent in that type of work (although we glean from the record that the duties did not appear to be onerous or dangerous). The union did not offer any statistics dealing with the number or types of injuries suffered by workers in either job classification from which the arbitrator could draw the conclusion that one job was more dangerous than the other. The only testimony of a comparative nature was the statement by the industrial hygienist that the gas tester "may be more exposed more continuously sometimes than the actual operator" to high concentrations of toxic gas. If the arbitrator credited this statement, which he did not refer to in his opinion, it would constitute some evidence that gas testing per se is more dangerous than dock work.

In view of the relatively benign indications about the hosewatchmen and dockworkers duties, the arbitrator perhaps could also have inferred that the mechanical aspects of performing the job (with the additional gas testing duties) were more dangerous than theretofore, so as to give sustenance to the award if it were viewed in a narrow light. However, while a narrow reading of Article VIII.M., i. e. focusing on the "inherent dangers" of gas testing vis a vis dockworking or hosewatching in their purely mechanical sense, would render this a case where there was barely (though probably) evidence to support the award, the arbitrator extended his discussion considerably so as to reflect a broad rather than narrow reading of Article VIII.M., i. e., that it prohibits the assignment of work if the assignment indirectly through its *result,* as opposed to directly through its performance, endangers the workers (the hosewatchers and dockworkers) beyond the usual and normal requirements of their jobs.

In this regard the arbitrator considered such matters as the training of dockwork-

ers, the skills and sophistication developed by full time gas testers through experience that can be gained only by doing gas testing on a full-time basis, the testimony of the industrial hygienist concerning conflicts of interest, and the factor that the general work environment of dockworkers was more dangerous when they performed the tests than when the tests were done by gas testers. The record demonstrates that the gas testers were more likely to perform the proper tests, read the meters correctly, and detect malfunctions in the equipment. Thus, there was less risk of a mistake and an accident if the tests were performed by gas testers. The arbitrator states that one of the usual and normal requirements of the dockworker's job was that he perform his duties in an environment judged safe by the gas testers. If, by performing the tests himself, the hosewatcher or dockworker does not provide a general work environment that is as safe for himself as that provided by gas testers, then he is endangered beyond the normal requirements of his job. There is clearly evidence (some of it summarized in part II of this opinion) to support the arbitrator's conclusion that full-time gas testers are more likely to perform the tests properly than are the dockworkers, hence to support the conclusion that the dockworkers' or hosewatchers' environment was less safe and their physical safety endangered beyond the usual and normal requirements of their job when they were doing the gas testing.

■ If the broader interpretation of Article VIII.M. "can in any rational way be derived from the agreement," *Ludwig v. Honold, supra,* the award must be upheld. While the broader interpretation of Article VIII.M. may not be the one we would have reached if we were faced with construing that provision, we cannot say that it has no rational basis in the agreement. The collective bargaining agreement between the company and the union contains an entire article dealing with the health and safety of workers. The article has fifteen subsections. We believe that this indicates the importance of health and safety matters to the parties. This concern is, of course, un-

derstandable, since the agreement covers employees working in a highly dangerous environment. The recent series of major refinery fires in the Philadelphia area is one indicator of the hazards of refinery work. The hazards of refinery fires are a proper subject of the arbitrator's notice. In such a context, we believe that an arbitrator can rationally and reasonably give broad construction to health and safety clauses of a collective bargaining agreement. As we once had occasion to note, in a somewhat different context, *see Michini v. Rizzo,* 379 F.Supp. 837, 853 (E.D.Pa.1974), *aff'd mem.,* 511 F.2d 1394 (3d Cir. 1975), a "little less" than maximum safety will not do in a hazardous occupation. Furthermore, the language of Article VIII.M. is not so precise as to preclude the broader construction that it was given by the arbitrator.

We have concluded that the arbitrator could rationally have interpreted Article VIII.M. to mean that the plaintiff may not assign additional duties to employees if the assignment results in that employee's work environment being less safe than it was prior to the assignment. There was also evidence to support the arbitrator's conclusion that the assignment of gas testing duties to dockers and hosewatchmen violated Article VIII.M., as thus construed. An order denying the company's motion for summary judgment, granting the union's motion for summary judgment, and entering judgment in its favor enforcing the arbitrator's award follows.[7]

---

7. The union has also requested that the court order the company to pay the costs and attorney's fees incurred by the union as a result of the company's refusal to abide by the arbitrator's award. As this opinion makes clear, this is a close case, hence we find that the company has not acted in bad faith in refusing to abide by the award or acted without justification in challenging the award. Therefore, we shall deny the union's request for fees and costs. *See U.M.W., District 50 v. Bowman Transportation, Inc.,* 421 F.2d 934, 935 (5th Cir. 1970).