SEABOARD WORLD AIRLINES, INC.,
Plaintiff-Appellee,

v.

TRANSPORT WORKERS UNION OF
AMERICA, AFL–CIO et al.,
Defendants-Appellants.

No. 753, Docket 35550.

United States Court of Appeals,
Second Circuit.

Argued May 10, 1971.

Decided May 26, 1971.

Henry G. Bisgaier, New York City (Cahill, Gordon, Sonnett, Reindel & Ohl, Laurence T. Sorkin and Ernest L. Garb, New York City, of counsel), for plaintiff-appellee.

Asher W. Schwartz, New York City (O'Donnell & Schwartz, Daniel Kornblum and Robert J. Dryfoos, New York City, of counsel), for defendants-appellants.

Before FRIENDLY, Chief Judge, and WATERMAN and HAYS, Circuit Judges.

PER CURIAM:

In our previous opinion, 425 F.2d 1086 (1970), we directed the district court to pass upon the legality of the provisions of a collective bargaining agreement and a supplemental security agreement made in 1964 between plaintiff, Seaboard World Airlines, Inc. and its flight navigators represented by defendant Transport Workers Union (TWU). The novelty of the agreements stemmed from the parties' knowledge that the navigators would ultimately be displaced by an

electronic device. Desiring to avoid disruptions as displacement drew nigh, Seaboard and TWU agreed that the contracts were to be "recognized by the parties as a permanent solution to all matters which are, or which could have been contained therein", and could be reopened only on July 1, 1974, and then solely with respect to compensation. The supplemental security agreement contained elaborate provisions in favor of 27 navigators whose initial date of employment (1951 or earlier) long preceded any threat of technological displacement. Five navigators employed in 1964 and any future hires were excluded from the benefits of the supplemental security agreement. Because of factors outlined in our previous opinion, 425 F.2d at 1088, by September 1969 the number of unprotected navigators had increased by 57 to a total of 62. All but 13 of these signed letters acknowledging awareness of the short-range nature of their jobs; the record here suggests that the 13 also were aware of this and of the lack of security protection. Nevertheless, by a letter dated October 14, 1969, and another dated August 3, 1970, TWU sought to reopen the agreement under § 6 of the Railway Labor Act, primarily with a view to obtaining security benefits for the newly hired navigators, which the 1964 "permanent solution" had expressly ruled out.

Little of probative value was added to the proof already in the record bearing on the legality of the agreement in the post-remand hearings of late May and early June 1970. Since that time, however, the Federal Aviation Agency gave its approval to Seaboard's application for installation of the pilot-operated inertial guidance system which was to substitute for navigators on some of Seaboard's certificated commercial routes, a fact to which the district court adverted in its opinion rendered September 22, 1970, holding the agreement legal. On the basis of this opinion, the district judge, on October 14, 1970, granted Seaboard's request for a permanent injunction to enforce the clause of the agreement which prohibited striking and picketing with respect to the 1964 agreements and, though neither the opinion nor order specifically says so, presumably dismissed TWU's counter-claim for an order requiring Seaboard to bargain on its reopener of October 14, 1969.[1] Moreover, we now know, by virtue of an affidavit submitted by counsel for appellants to this court in support of a stipulation between the parties concerning extension of time to file briefs, that

[d]uring October, 1970, after reaching an agreement with its pilots for their use of an inertial system of navigation plaintiff-appellee laid off its so-called unprotected navigators by reason of their displacement by that system

and that

---

1. TWU notes that "[t]he judgment ignores the defendants' counterclaim for a judgment directing Seaboard to negotiate with the defendants in good faith, but it is assumed for the purposes of this appeal that the counterclaim was denied." Perhaps the district court was acting out of an abundance of caution in this respect:

The attorneys for both parties in the course of extensive colloquy which marked the postremand hearings were in agreement that the resolution of the issues upon the applications for interim relief would in effect dispose of the action itself as though the action had been fully tried. No stipulation, however, was entered into by them to that effect, nor is it clear that an evolving

and complex situation, such as is here presented, lends itself readily to so desirable a conclusion.

Opinion of Rosling, J., fn. 1. In any event, although the district court was of the opinion that whatever it "now does in compliance with the mandate [of the Court of Appeals] will not per se dispose of other issues framed by the pleadings," and although we do not mean to suggest that TWU may not apply to the district court should "conditions * * * have sufficiently changed to warrant relief or for other good cause shown," as provided in the order granting the permanent injunction, we see no basis on the present record for not affirming the "assumed" denial of TWU's counterclaim.

[o]n or about December 1, 1970 the plaintiff-appellee laid off many of the so-called "protected" navigators for the same reason and laid off the remaining "protected" navigators on or about January 1, 197[1].

■ TWU's claims of invalidity of the prohibition of reopening the 1964 settlement of the security issue require little comment. The contention that the provisions of § 6 of the Railway Labor Act, 45 U.S.C. § 156, whereby "[c]arriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions," means that any agreement must be subject to reopening every thirty days would convert an Act intended as an instrument for achieving industrial peace into a potent weapon for perpetual warfare. It also defies what was necessarily assumed in such decisions as Flight Engineers' Int'l Ass'n v. American Airlines, Inc., 303 F. 2d 5, 13 (5 Cir. 1962) and Brotherhood of R.R. Trainmen v. Akron & Barberton Belt R.R., 128 U.S.App.D.C. 59, 385 F.2d 581, 603–604 (1967), cert. denied 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983 (1968). We likewise see nothing in § 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d), or in the Labor Board's "contract bar" rule that would warrant any inference that parties to an agreement under the Railway Labor Act may not bind themselves against reopening for a period reasonable under the particular circumstances at issue. We are not required to consider what the effect of the agreement would have been if TWU had been superseded by another union. Neither do the facts here require us to consider what would be the proper result if the expected technological advances had been delayed for so long a period that the "new hires" could legitimately have acquired some expectation of permanency, despite what they had been told at the time of hiring. The Union's argument that by negotiating security arrangements for navigators who had been on the property for 13 years or more but not for the "new hires," it violated the duty of fair representation imposed by Steele v. Louisville & Nashville R. R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), and its progeny, must likewise be rejected.[2] The amounts Seaboard would and could devote to displacement benefits were not unlimited; the Union was performing rather than violating its duty of fair representation when it negotiated an agreement whereby these amounts would go to the benefit of men who had legitimately believed they were permanently employed, rather than to new hires, many of whom were already displaced from other airlines and most or even all of whom accepted employment knowing their tenure would be only temporary. Indeed, as the Court noted in *Steele*, "[v]ariations in the terms of the contract based on differences relevant to the authorized purposes of the contract in conditions to which they are to be applied, such as differences in seniority * * * are within the scope of bargaining representation of a craft, all of whose members are not identical in their interest or merit." 323 U.S. at 203, 65 S.Ct. at 232.

2. The Union argues that the permanent exclusion of the unprotected navigators from the benefits of the supplemental security agreement "is not to be confused with any claim or contention that when the Basic Collective Agreement and SSA were made there was any breach by the Union of its duty of fair representation." Rather, it dresses its argument in "constitutional" clothing apparently assuming that this strengthens its attack on the agreements. In light of the Court's statement in *Steele*, on which the Union heavily relies, that "the Railway Labor Act imposes upon the statutory representative of a craft *at least as exacting a duty* to protect equally the interests of the members of the craft as the Constitution imposes upon a legislature to give equal protection to the interests of those for whom it legislates," 323 U.S. at 202, 65 S.Ct. at 232 (emphasis supplied), we fail to see the significance of appending the word "constitutional" to the alleged denial of rights resulting from the 1964 agreements.

The Union argues also that if the agreements "terminated" with the dismissal of the navigators, its obligations not to reopen and not to strike or picket likewise ceased. This is a verbal quibble. To be sure, the effect of the dismissal of the navigators was that there was nothing on which provisions in regard to salaries, grievances, etc. could operate. But that does not terminate the agreements in the sense of freeing either party from obligations still capable of performance, as the Union would be the first to assert if Seaboard failed to comply with the provisions of the supplemental security agreement for the benefit of the 27 displaced navigators.

Affirmed.