Roger LENFEST, Jr., et al, Plaintiffs,

v.

BOSTON & MAINE CORPORATION,
Debtor, et al, Defendants.

Civ. A. No. 80–2240–C.

United States District Court,
D. Massachusetts.
May 7, 1982.

Ann M. Gilmore, Gilmore & Iamdoli, Elizabeth A. Rodgers, Doyle, Playter, Novick & Berkin, Boston, Mass., for plaintiffs.

Ralph Moore, Jr., Shea & Gardner, Washington, D. C., Charles W. Mulcahy, Boston, Mass., for Boston & Maine Corp.

Norton N. Newborn, Cleveland, Ohio, Gaines & Stern Co., LPA, and Thomas L. Crotty, Jr., Robert Malone, Malone, McCarthy & Hunt, Boston, Mass., for United Transp. Union and Peter Carbone.

## MEMORANDUM

CAFFREY, Chief Judge.

This civil action has been brought against the United Transportation Union (UTU), the Boston & Maine Corporation (B&M), and its trustees-in-bankruptcy by 61 members of the UTU who challenge the validity of Arbitration Award 387. This Award, which was handed down on September 20, 1980, resolved a longstanding labor dispute between the B&M and about 650 of their train service employees, for whom the UTU is the exclusive bargaining agent. Plaintiffs' complaint consists of six counts, three against both the union and the railroad, two against the union alone, and one against the railroad alone.

Plaintiffs' basic complaint is that officials of the union who were not authorized to do so agreed to submit the union members' dispute with the railroad to binding arbitration; they also claim that the B&M had notice that the union's action was not authorized. Plaintiffs claim that as a result, the Arbitration Award is invalid under the Federal Railway Labor Act and state contract law. They ask this Court to enter a

declaratory judgment to that effect, to enjoin the further implementation of Award 387, to order the restoration of the terms and conditions of their employment contract that existed prior to the announcement of the Award, and to award the individual plaintiffs monetary damages suffered as a result of the defendants having entered into the Agreement to Arbitrate. The defendants' position in short is that the Award is valid because the union officials who entered into the Agreement to Arbitrate acted completely within their powers as established by the UTU Constitution.

Plaintiffs' claim of a right to a jury trial on all counts was opposed prior to the start of trial by the railroad. The Court did not render a decision on this issue, but instead impaneled a jury and proceeded to trial. At the close of the plaintiffs' case, both the union and the railroad moved for directed verdicts. The Court reserved judgment on these motions, and the defendants proceeded with their cases. At the close of the railroad's case, which was presented after the union's case, plaintiffs presented one rebuttal witness, after which both defendants renewed their motions for directed verdicts.

After considering all of the evidence as I must in a light most favorable to the non-moving party, and applying the applicable standard of this circuit,[1] I rule that the defendants' motions should be granted, and that judgment should be entered in their favor. For the purpose of deciding these motions, I have assumed without ruling that the plaintiffs have a right to a jury trial on all counts, and thus find it unnecessary to rule on the jury trial question.

*The Facts*

The relevant and uncontested facts of this dispute are as follows:

The defendant UTU—an unincorporated association and an international labor union whose headquarters is in Cleveland, Ohio— is the exclusive collective bargaining repre-

---

1. "The rule in this circuit remains that a scintilla [of evidence] is insufficient [to overcome a motion for a directed verdict.]". *Magnat Corporation v. B&B Electroplating*, 358 F.2d 794, 797 (1st Cir. 1968).

sentative for about 650 train service employees of the Boston & Maine Corporation who were affected by Award 387. The UTU is governed by a Unification Agreement and Constitution (the Constitution) which was introduced into evidence on the first day of trial as Plaintiffs' Exhibit 1. Article 82 of this Constitution provides for the creation of General Committees of Adjustment. Each General Committee is comprised of the chairmen of all local committees of adjustment (created under Article 81) within the jurisdiction of each General Committee of Adjustment. The relevant General Committee for purposes of this law suit is the Boston & Maine Corporation General Committee of Adjustment (hereinafter referred to as the General Committee).

The duties of these General Committees are spelled out in Article 85 of the Constitution, which states in relevant part:

General Committees of Adjustment shall have the authority to make and interpret agreements with representatives of transportation companies covering rates of pay, rules, or working conditions—all in accordance with the provisions of this Constitution.

\* \* \* \* \* \*

In the event that a matter cannot be satisfactorily adjusted, the General Chairman may request the assistance of the International President. Upon receipt of such a request, the International President or his representative shall meet with the General Chairman and renew efforts to obtain a satisfactory adjustment of the matter. He, or his representative, shall be vested with the same authority held by the General Committee to progress the matter to a conclusion.

\* \* \* \* \* \*

Between sessions of the General Committee of Adjustment, the Chairman of such Committee shall exercise all rights, privileges, and authority vested in the General Committee, except as otherwise directed by the General Committee while in session.

\* \* \* \* \* \*

The General Chairman must poll the entire General Committee prior to signing any system agreements and be governed by a majority of the votes cast.

\* \* \* \* \* \*

Actions or decisions of a General Committee shall be binding upon the members and locals under the jurisdiction of such General Committees unless reversed or modified upon appeal as provided in Article 75 of this Constitution.

Article 16 gives the International President the power to "interpret all laws of the organization, [and to] decide all questions arising therefrom. ..."

Plaintiffs in their first count seek to have the Arbitration Award set aside under Section 9 of the Railway Labor Act (45 U.S.C. § 159) because of the Award's failure to substantially comply with Sections 7 and 8 of that Act. Specifically, plaintiffs claim in paragraph 45 of their complaint that the Agreement to Arbitrate which authorized the Award was never made by the General Committee, which they claim is one of the parties to the longstanding employment dispute due to the power granted it in the first sentence of Article 85 of the Constitution. Section 7 of the RLA requires that agreements to arbitrate be made by the "parties" to a dispute. 45 U.S.C. § 157. They also maintain in paragraph 46 that the Agreement to Arbitrate was not signed by the "duly accredited representatives" of the employees, as required by Section 8 of the RLA. 45 U.S.C. § 158. Plaintiffs admit that the Agreement to Arbitrate, which was submitted into evidence as Plaintiffs' Exhibit 39, was signed by both P.S. Carbone, the General Chairman of the General Committee, and E. F. Lyden, a UTU International Vice President. Plaintiffs claim, however, that neither of these men were authorized by the General Committee to submit the dispute to binding arbitration. Trial transcript at 37 (Plaintiffs' opening argument). As will be seen, no evidence has been presented which would justify such a finding or allow it to stand if made.

As succinctly stated by the Supreme Court, the Railway Labor Act

provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens 'substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President' who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the *status quo.* §§ 2 Seventh, 5 First, 6, 10. *Railroad Trainmen v. Terminal Co.,* 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969). If arbitration is not rejected and the National Mediation Board's proffer of arbitration is accepted by the parties, the dispute is heard and decided by an arbitration board under Sections 7–9 of the Act, 45 U.S.C. §§ 157–159.

Evidence introduced at trial unequivocally shows that in January of 1977, John Scanlan, who was then General Chairman of the General Committee, first invoked the mechanism of the Railway Labor Act by serving a so-called Section 6 notice upon a representative of the railroad. (Plaintiffs' Exhibit 41.) Subsequent Section 6 notices were served by the Chairman of the General Committee on the B&M on November 20, 1978 (Plaintiffs' Exhibit 42); January 17, 1979 (Plaintiffs' Exhibit 46); March 6, 1979, and March 23, 1979 (Plaintiffs' Exhibit 45). Section 6 notices were served by the B&M on the union on October 3, 1978 (Plaintiffs' Exhibit 43); and April 4, 1979 (Plaintiffs' Exhibit 44).

On May 21, 1979, P. S. Carbone, who was then and is now the General Chairman of the General Committee, informed the members of that Committee that he had requested the President of the union, Al H. Chesser, to request the services of the National Mediation Board pursuant to Section 5 of the Railway Labor Act "as a result of negotiations on this property coming to an impasse." (Plaintiffs' Exhibit 6).

During his testimony at trial, Mr. Carbone stated that as of March 6, 1979, an International Vice President, Paul J. McNamara, had been assisting him "on the property" of the B&M (*i.e.* within the jurisdiction of the General Committee) with the B&M negotiations. Mr. Carbone testified that Mr. McNamara had been assigned to assist his predecessor, General Chairman Walsh, in either 1977 or 1978, pursuant to Mr. Walsh's request for International assistance in negotiating the dispute. (Trial Transcript (4) 34–35; (5) 3–4). Mr. McNamara's uncontroverted testimony was that he was participating in the UTU–B&M negotiations as President Chesser's representative. Trial Transcript at (6) 13–14. Plaintiffs' Exhibit 59 is a March 7, 1979 letter from Mr. Chesser to Mr. Carbone which the writer states will serve as Mr. McNamara's "authority to assist you in handling" the negotiations. Since plaintiffs have presented no evidence which would tend to contradict this evidence, I rule that the jury would be compelled to find that at some point prior to March 6, 1979, General Chairman Walsh had requested the assistance of the International President as allowed by Article 85 of the UTU Constitution, and that Mr. McNamara was assisting Mr. Carbone as of that date as the President's representative.

On October 12, 1979, Mr. McNamara wrote Mr. Chesser a lengthy letter in which he reported on recent developments in the mediation proceedings. This letter was introduced into evidence as Defendants' Exhibit A. After reporting that the mediation had progressed as far as it was going to go, Mr. McNamara stated:

I would appreciate your using the power of your good office to contact the member or chairman of the National Mediation Board to release the organization from these mediation proceedings and to proffer arbitration to the parties as the next step in the Railway Labor Act, as amended. If this is accomplished, and arbitration is proffered, I recommend that we accept arbitration to resolve the issues contained in dispute.

On November 30, 1979, Al H. Chesser, the President of the International, sent a telex (a copy of which was submitted as Plaintiffs' Exhibit 52) to Robert O. Harris, chairman of the National Mediation Board, informing him that "a complete impasse has been reached between parties and conferences [were] terminated this date by representatives of UTU." Mr. Chesser "request[ed] your board [to] immediately submit a proffer of arbitration to the parties involved," pursuant to §§ 5 First and § 7 of the Railway Labor Act.

On December 14, 1979, the executive secretary of the National Mediation Board, Rowland K. Quinn, Jr., sent a letter (a copy of which was submitted into evidence as Plaintiffs' Exhibit 65) to both President Chesser and B.E. Rice, Jr., the Vice President for labor relations of the B&M, in which Mr. Quinn on behalf of the NMB urged the parties, pursuant to § 5 First of the RLA, to submit their dispute to binding arbitration, pursuant to § 8 of the Act. Mr. Chesser responded to this proffer in a letter to Mr. Quinn on December 17, 1979 (a copy of which was introduced into evidence as Plaintiffs' Exhibit 66). President Chesser stated in this letter that "the United Transportation Union is agreeable to submitting the above dispute to arbitration."

A letter dated December 28, 1979 from Mr. Rice of the B&M to Mr. Quinn of the NMB (a copy of which is in evidence as Defendants' Exhibit G–21) states that the B&M "is agreeable to submitting the dispute . . . to arbitration," and that its representatives were prepared "pursuant to Section 8 of the RLA to meet at the earliest opportunity in order to propose the necessary agreement governing the arbitration." The letter concluded that as soon as this agreement was completed, it would be submitted to the "Reorganization Court"—*i.e.* the United States District Court for the District of Massachusetts—"for approval of the Agreement and Authorization to proceed with the arbitration."

By letter of January 4, 1980 (a copy of which was submitted into evidence as Defendants' Exhibit G–23) Fred A. Hardin, who had replaced Mr. Chesser as UTU International President four days earlier, notified Mr. Quinn of the NMB that due to the retirement of Vice President McNamara effective January 1, 1980, International Vice President E.F. Lyden had been assigned to represent the union in the arbitration proceedings.

Defendants' Exhibit E is a copy of a January 11, 1980 letter from Mr. Rice of the B&M to Mr. Lyden, stating that the document attached to the letter is a draft copy of the Agreement to Arbitrate that "we" had drafted that day. The attached two-paged draft copy bears the initials of both Mr. Rice and Vice President Lyden. Both men testified at trial that they had attended a meeting on January 11, 1980 at which the agreement was drafted, that they had each initialed the draft, and had decided to defer execution of the Agreement until it was approved by the "Reorganization Court." Trial transcript at (6) 115–16; 170–74.

Defendant's Exhibit H is a copy of an excerpt from the transcript of a hearing conducted on March 4, 1980 by the Honorable Frank J. Murray, Senior District Court Judge of the United States District Court for the District of Massachusetts, for the purpose of determining whether that court, which was and is supervising the B&M's bankruptcy reorganization, should give its approval to the Agreement to Arbitrate and thus allow the B&M to enter into binding arbitration. This transcript shows that Vice President Lyden appeared at the hearing and identified himself to the court as the spokesman for the union. He stated that the UTU had agreed to the arbitration

agreement without modification as it had been initialed subject only to the court's approval of the agreement, and that "if the Court approves it on that basis, we would be more than willing to execute the agreement with full signatures." Judge Murray's March 6, 1980 order authorizing the B&M's trustees to agree to binding arbitration was submitted into evidence as Defendant's Exhibit P.

Plaintiffs' Exhibit 39 is a copy of the Agreement to Arbitrate; it is the same as the draft agreement attached to Defendants' Exhibit E, except that it bears the date of March 18, 1980, and the signature of General Chairman Carbone and Vice President Lyden for the UTU, and J. J. Cronin, director of labor relations for the B&M, and Mr. Rice for the Trustees of the B&M.

Evidence was introduced which shows that after the UTU International President had accepted the NMB's proffer of arbitration, three B&M employees who are also UTU members (two of whom are plaintiffs here) began to seek information about the manner in which the employees' dispute was being handled by General Chairman Carbone. In a letter of December 22, 1979 (Plaintiffs' Exhibit 11), R.M. Lenfest, Jr., C.W. Paige, Jr., and J. Sylvan asked President Chesser for "clarification" of Chairman Carbone's handling of the dispute. The letter asked in particular for a ruling on "when" a July 1979 amendment to Article 85 of the UTU Constitution "would come into play in the handling of this dispute by the General Chairman . . . ." That amendment states: "The General Chairman must poll the entire General Committee prior to signing any system agreements and be governed by the majority of the votes cast." Plaintiffs' Exhibit 1.

By letter of February 11, 1980, a copy of which was submitted into evidence as Plaintiffs' Exhibit 16, the three signers of the December 22 letter to President Chesser (who had retired from that position in the interim), wrote to the new president, Fred A. Hardin, requesting him to answer the December 22 letter.

By letter of February 15, 1980 (Plaintiffs' Exhibit 15), President Hardin responded to the UTU members' letters. He stated, "[A]s I am sure you are aware, the parties, the UTU, and the Boston and Maine Corporation have agreed to submit this dispute to arbitration. . . ." He further stated that since the decision by the arbitration board would be final and binding on both parties on all facets of the dispute, "the ratification provisions of Article 85 are not applicable."

Two of the authors of the above letters to the International President, who are among the plaintiffs herein, then wrote to John H. Shepherd, the General Secretary and Treasurer of the UTU, on May 10, 1980, to appeal to the UTU Board of Directors pursuant to UTU Constitution Article 75 "the decision of UTU President Fred A. Hardin, (as set forth in his letter dated February 15, 1980). . . ." A copy of this letter was introduced into evidence as Plaintiffs' Exhibit 33. On July 23, 1980, Mr. Shepherd wrote Mr. Lenfest and Mr. Sylvan. Mr. Shepherd stated that on July 14, 1980, the UTU Board of Directors "gave careful consideration to all of the evidence presented in this case, both written and oral, and it was moved, seconded and carried (President F. A. Hardin not participating) that the appeal be denied." A copy of this letter is in evidence as Plaintiffs' Exhibit 35.

Plaintiffs' Exhibit 74 is a copy of a May 27, 1980 letter from President Hardin to Vice President Lyden, in which the writer states that since Vice President McNamara was "assigned [to the dispute] under the provisions of Article 85," which gave him "the same authority as the General Committee," and since Mr. Lyden had been appointed to succeed Mr. McNamara, the agreement to send the union member's dispute to arbitration did not need to be ratified by the General Committee.

Plaintiffs' Exhibit 3 is a copy of the minutes of the January 25, 1975 meeting of the General Committee. Page 8 bears the following notation:

Motion-Brothers G. R. MacPherson, Local 558, and E. G. Greenlaw, Local 428, to grant authority to the General Chairman

in keeping with Article 80(c) of the United Transportation Union Constitution to negotiate to a conclusion the pending proposition by the Carrier in bankruptcy to modify the work contract.

Plaintiffs' Exhibit 4 is a copy of the minutes of the October 3, 1977 meeting of the General Committee. Page 11 bears the notation of a motion made to "reaffirm" the action taken by the 1975 General Committee "as set forth on page 8 of the Minutes" of that meeting. The notation shows that the motion was passed.

Roger Lenfest, one of the plaintiffs in this case who was first elected a local chairman in August of 1977 (Trial transcript at (2) 5) testified that "[t]he motions in intent and purpose were to give the General Chairman of the General Committee the authority to make or modify rules with the Boston and Maine Railroad." Trial Transcript at (2) 15.

Plaintiffs' Exhibit 5 is a copy of the minutes of the January 28, 1979 meeting of the General Committee, at which Mr. Carbone was elected General Chairman. Page 6 of the minutes bears the notation of a motion to "rescind the [1/25/75] action taken by the Full General Committee of Adjustment . . . as set forth on page 8 . . . ." The notation show that this motion was passed. Mr. Lenfest stated at trial that his understanding of this motion was that "Mr. Carbone's authority was restricted" by the General Committee, acting under Article 85, "from modifying or changing the rules of our contract on his own." Trial Transcript at (2) 17. Under cross-examination, Mr. Lenfest stated that while the motions themselves make reference to Article 80(c), "none of these motions specifically stated Article 85." Trial Transcript at (3) 40–41.

Three items constitute the final segment of relevant evidence in this dispute. On April 30, 1980, General Chairman Carbone wrote to all of the local chairmen who comprised the General Committee of Adjustment concerning the UTU's acceptance of the proffer to arbitrate the employment dispute with the B&M. A copy of this letter was introduced as Plaintiffs' Exhibit 30. In this letter, Mr. Carbone informed the recipients of the appearance of Vice President Lyden at a meeting of Local 898 on April 25, 1980, and reiterated the explanation Mr. Lyden gave to those present at that meeting about the International's acceptance of the NMB's proffer of arbitration. Mr. Carbone stated in the concluding sentence of this letter: "I would appreciate your views and comments on the above-mentioned subject by filling in the attached and returning it to this office in the self-addressed stamped envelope." The attachment to this letter (a copy of which was introduced as Plaintiffs' Exhibit 31) is labeled "Comments on Binding Arbitration." It requests the recipient to "[p]lease circle as to whether you are in favor or against, and any remarks." Immediately following this instruction appear the words "IN FAVOR" and "AGAINST"; the word "Remarks:" appears immediately below, followed by a blank space. Finally, lines are set out for a signature and date. Mr. Carbone testified at trial that 19 of these attached forms were returned to him; these forms were introduced into evidence collectively as Plaintiffs' Exhibit 70. Trial Transcript at (5) 32–35. Of the nineteen returned ballots, 15 had the words "IN FAVOR" circled; and four had the words "AGAINST" circled.

The documents listed above comprise all of the material documentary evidence presented at trial. The major portion of this documentary evidence was presented by plaintiffs during the first day of what turned out to be a eight-day trial. Except as noted, testimony given at trial served only to re-enforce the facts which these documents on their faces establish.

*Count 1*

█ In order to succeed in their claim under Count 1, plaintiffs by their own admission must show that the agreement to arbitrate was not entered into by a duly authorized representative of the General Committee. The material evidence dictates that there can be and is no dispute over the facts that:

1. A general chairman had requested the assistance of the UTU International President in negotiating the contract dispute between UTU members and their employer, the B&M Corp.

2. UTU International Vice President McNamara, who had been assigned pursuant to Article 85 as the International President's representative to assist General Chairman Carbone, advised President Chesser to ask for and accept a proffer of arbitration from the NMB.

3. UTU International President Chesser requested the NMB to proffer arbitration to the parties, and subsequently accepted that proffer when it was offered.

4. The agreement to arbitrate was signed by both International Vice President Lyden and General Chairman Carbone.

5. Two of the plaintiffs in this case requested the International President to interpret the applicability of a 1979 amendment of Article 85 of the UTU constitution to the action taken by General Chairman Carbone with respect to the agreement to accept binding arbitration. President Hardin interpreted the amendment of Article 85 adversely to plaintiffs' position. Plaintiffs' appeal of that interpretation was denied by the UTU Board of Directors.

6. The General Committee by a vote of 15–4 ratified the decision to accept binding arbitration.

As stated above, Article 85 of the UTU Constitution provides that when the International President's assistance has been requested in a contract dispute by the General Chairman (as is indisputably the case here), "[h]e, or his representative, *shall be vested with the same authority held by the General Committee to progress the matter to a conclusion*" (emphasis added). Plaintiffs do not contest the facts that International Vice President McNamara urged President Chesser to ask for and accept from the NMB a proffer of arbitration, that Mr. Chesser did in fact ask for, receive and accept the NMB's proffer of arbitration, and that International Vice President Lyden signed the Agreement to Arbitrate as a representative of the union. They merely claim that these acts were done without the authority of the General Committee.

Plaintiffs, however, have introduced no documentary or testimonial evidence which casts any doubt as to the meaning of the plain and unambiguous language of Article 85 which provides that given the facts of this case, the International President or a Vice President acting as his representative "shall be vested with the same authority held by the General Committee to progress the matter to a conclusion." Plaintiffs merely allege that the language emphasized above is "ambiguous," and that these union officials were required by Article 85 to "poll" the General Committee before acting as they did. Plaintiffs, however, have offered no evidence of ambiguity; the words quoted above from Article 85 are very clear. The fact that past practice may show that in other instances which plaintiffs claim are similar to the one discussed here, International representatives may have sought the approval of the General Committee before acting is not probative at all on the issue of whether the International representatives were authorized to act as they did. In the instances offered by the plaintiffs the International representatives may have sought General Committee approval in order to help preserve peace and amicable relations between the International and the local General Committee involved. This proves nothing about the authority or the lack of authority of an International president (or his representative) to act without the prior approval of the General Committee once he has been called in under Article 85 to assist the General Chairman. I rule that a clear grant of authority in the Constitution may be used when the President decides to do so even if on prior occasions with different facts he has elected to travel a different route also authorized by the Constitution.

The UTU Constitution itself provides definitive guidance for the making of the determination of whether the International representatives acted within their Article 85 powers. Article 16 of that Constitution gives the International President the power

to "interpret all laws of the organization, [and] decide all questions arising therefrom . . . ." As Mr. Lenfest admitted at trial, Mr. Chesser obviously made the determination that he had the power under Article 85 to ask for and accept a proffer of arbitration without getting the approval of the General Committee. (Trial Transcript at (3) 150.) Further, in a letter of May 27, 1980 from President Hardin to Vice President Lyden (Plaintiffs' Exhibit 74), Mr. Hardin stated that it was Mr. McNamara who originally accepted arbitration on behalf of the union, and that Mr. Lyden had been appointed upon Mr. McNamara's retirement to "finalize the agreement." He stated: "Vice President McNamara was assigned under the provisions of Article 85 of our Constitution, and under those provisions the Vice President has the same authority as the General Committee. In view of this it would be no requirement that [the Agreement to Arbitrate] be ratified." Thus all of the actions undertaken by International representatives which the plaintiffs claim were unauthorized under Article 85 have been approved by the International President under Article 16.

■ Interpretations of union constitutions by union officials are by no means absolutely insulated from review in a court of law. However, the applicable law, which is based on a general and well-recognized policy of judicial non-interference with the judgment of union officials and tribunals having responsibility for the interpretation of a union's constitution, holds that absent a demonstration of bad faith, such interpretations will not be overturned unless they are shown to have been unfair and unreasonable. *Truck Drivers v. International Brotherhood of Teamsters*, 482 F.Supp. 266, 272 (D.C.Mass.1979); *Stelling v. International Brotherhood of Electrical Workers*, 587 F.2d 1379, 1388 (9th Cir. 1978), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2890, 61 L.Ed.2d 315 (1979), *Local Union No. 657, Etc. v. Sidell*, 552 F.2d 1250, 1256–57 (7th Cir.), *cert. denied*, 434 U.S. 862, 98 S.Ct. 190, 54 L.Ed.2d 135 (1977); *Vestal v. Hoffa*, 451 F.2d 706, 709 (6th Cir. 1971), *cert. denied*, 406 U.S. 934, 92 S.Ct. 1768, 32 L.Ed.2d 135 (1972);

*Gardner v. Woodcock*, 384 F.Supp. 239, 247 (E.D.Mich.1974).

Despite the plaintiffs' claims to the contrary, there has been absolutely no evidence introduced that would justify a finding by the jury that Mr. McNamara, Mr. Chesser, Mr. Hardin, or Mr. Lyden acted in bad faith toward the members of the union in acting as they did. While Mr. Lenfest testified that it was his belief that all four of these men had acted in "bad faith" (Trial Transcript at (3) 149–52), no facts were presented by the plaintiffs which would justify this opinion. On the contrary, the uncontroverted testimony of Mr. McNamara was that he was motivated in his actions by a desire to achieve what he believed would be the best result for all of the union members. (Trial Transcript at (6) 61–63; 98–99). He stated without contradiction that the UTU did not want to risk the loss of 700 B&M jobs by calling a strike against the bankrupt B&M because the UTU had the prior experience of calling a strike against the bankrupt Rock Island Railroad with the result that it ceased operations and all UTU employees thereof lost their jobs. Trial Transcript at (6) 69–70. Given the negotiating impasse once striking was rejected for "Rock Island" considerations, the only other course of action open to the UTU and Vice President McNamara was binding arbitration. In light of plaintiffs' failure to produce any objective evidence which would tend to establish the bad faith of these men, I rule that the record would not support such a finding if the issue were to be determined by the jury.

In order to allow the jury to determine whether the above interpretations of the union constitution were "unfair and unreasonable," there must be some evidence to that effect that would justify such a finding. Since both of these interpretations are well within the plain meaning of the provisions of Article 85, which was the subject of the interpretations, I rule that a finding that the interpretations were "unfair and unreasonable" could not be supported by the evidence. Since the actions of these men were not executed in "bad faith" and

were not "unfair or unreasonable," there is no ground upon which the affirmance of the validity of the questioned actions made by the International Presidents under Article 16 of the union constitution could be upset.

There thus is no evidence on which the jury could base a finding that the International Presidents and Vice Presidents acted in manner that were not fully authorized by the words of Article 85. I therefore rule that the actions of these officials were fully authorized by Article 85, and, thus cannot constitute a basis for the setting aside of the arbitration award. I should note that, in any event, construction of a written document is a matter for the Court, not a jury, and that any finding by a jury (were they allowed to pass on the issue) that Article 85 did not authorize the International Presidents and Vice Presidents to progress the dispute to a conclusion as was done here would have to be set aside as being totally against the evidence.

Plaintiffs also argue, nevertheless, that in signing the agreement to arbitrate as a representative of the union, General Chairman Carbone was in violation of the 1979 amendment to Article 85, which requires the General Chairman to "poll the entire General Committee prior to signing any system agreements and be governed by the majority of the votes cast." Plaintiffs' argument is simply that the Agreement to Arbitrate is a "system agreement." Since Mr. Carbone did not poll the General Committee prior to signing the agreement, *his* signature of the agreement to arbitrate was unauthorized.

I first note that even if Mr. Carbone's signature was unauthorized, Vice President Lyden's signature, as established above, was authorized. There is no doubt that the presence of the signature of an unauthorized representative of the union on the Agreement to Arbitrate which Agreement was also signed by an authorized union representative would be mere surplusage and would not affect the validity of that document when there has been no evidence presented to prove that more than one au-

thorized signature was needed to bind the union to the terms of the document. To the extent there has been evidence at all on this issue, it has been to the contrary. See testimony of Mr. Lyden, Trial Transcript at (6) 134.

Plaintiffs have failed to present evidence that would justify a finding that Mr. Carbone's signature was not authorized. As stated above, plaintiffs' argument is that the Agreement to Arbitrate was a system agreement, requiring prior approval by the General Committee. While some small amount of testimony was presented at trial about whether an "agreement to arbitrate" is a "system agreements" (*see, e.g.* testimony of Roger Lenfest, Trial Transcript at (2) 8), such a determination need not be made here by the finder of fact, for the record of this case is clear that the authorized union officials have already ruled that the "system agreements" amendment to Article 85 did not apply to Mr. Carbone's actions respecting the decision to accept binding arbitration. *See* discussion of Plaintiffs' Exhibits 11, 16, 15, 33 and 35, *supra.*

The interpretation of the UTU Constitution in question here was made by International President Hardin pursuant to Article 16 in his letter of February 15, 1980 (Plaintiffs' Exhibit 15). That interpretation was affirmed by the UTU Board of Director's in their denial of the appeal made pursuant to Article 75 by Mr. Lenfest and Mr. Sylvan. This decision is memorialized in the July 14, 1980 letter of UTU General Secretary and Treasurer Shepherd (Plaintiffs' Exhibit 35).

As stated above, plaintiffs burden was to prove that these union officials acted in bad faith in making these interpretations, or that the interpretations themselves were "unfair and unreasonable" in order for the jury to be allowed to set their interpretations aside. No evidence was introduced by plaintiffs adequate to show that those decisions were made in bad faith by the president and the board of directors; there thus would be no basis in fact for such a finding by the jury. The evidence must be capable of showing that the International President's constitutional interpretation and the

UTU Board of Director's affirmance of that interpretation were "unfair or unreasonable" in order for the finder of fact to be allowed to overrule those decisions. Evidence that the plaintiffs' interpretation of Article 85 is more plausible than the interpretation adopted by the UTU President and Board of Directors is not sufficient; rather, the evidence at this point must show that the Agreement to Arbitrate is so obviously covered by the "system agreements" amendment to Article 85 that any other reading would be unfair and unreasonable. I rule that the plaintiffs have not presented evidence on this issue that would merit its submission to the jury.

Plaintiffs, however, have a second theory for their claim that Mr. Carbone was not authorized to sign the agreement to arbitrate. They claim that at its 1979 meeting, the General Committee, acting pursuant to its power under Article 85, voted to rescind the power it had granted the General Chairman in 1975 "to negotiate to a conclusion the pending proposition by the carrier in bankruptcy to modify the work contract." Plaintiffs' Exhibits 3 and 5, discussed *supra*. Other than the minutes to the meetings at which these motions were made and passed, the only evidence regarding the intent and purpose of these motions was given in testimony by plaintiff Roger Lenfest, who became a member of the General Committee in 1977. There is no evidence that Mr. Lenfest was at the 1975 General Committee meeting, or that he had anything to do with the relevant motion made at that meeting. Mr. Lenfest also admitted in cross-examination that these motions refer specifically to Article 80(c), and do not mention Article 85.

I note that even if the plaintiffs have under this theory presented evidence sufficient to warrant a finding of fact in their favor by the jury, even a finding for the plaintiffs on this issue would not materially aid their cause. As I have stated, Mr. Lyden's signature on the agreement to arbitrate clearly was authorized, even if Mr. Carbone's was not, and there has been no evidence submitted which indicates that Mr. Carbone's signature in any event is anything more than redundant.

Even if the above were not enough to justify the granting of both defendants' motions for directed verdicts with respect to Count 1, the evidence unequivocally shows that the agreement to arbitrate was subsequently ratified by the General Committee even if it had not been previously authorized. Simply put, plaintiffs argument is that Mr. Lyden and Mr. Carbone were the agents of the General Committee. In executing the agreement to arbitrate, these two men merely exceeded the scope of their authority as agents, according to the plaintiffs. It is, however, a basic principle of agency law that a principal, such as the General Committee, may ratify a prior unauthorized act of an agent by expressed or implied affirmation of the act. The effect of such an affirmation is to supply the authority that was lacking when the act was taken. *Shearson Hayden Stone, Inc. v. Leach*, 583 F.2d 367, 369 (7th Cir. 1978). While full knowledge on the part of a principal of all material facts is an essential element to a valid ratification, *Master Commodities, Inc. v. Texas Cattle Management Co.*, 586 F.2d 1352, 1359 (10th Cir. 1978), a principal can ratify any act that he could have authorized in the first place. *Berk v. Laird*, 317 F.Supp. 715, 728 (E.D.N.Y.1970), aff'd sub. nom. *Orlando v. Laird*, 443 F.2d 1039 (2d Cir. 1971), cert. denied, 404 U.S. 869, 92 S.Ct. 94, 30 L.Ed.2d 113 (1971).

As Plaintiffs' Exhibits 30 (the April 30, 1980 letter from Mr. Carbone to the members of the General Committee), 31 (the attached form), and 70 (the 19 completed and returned forms) show, the General Committee did in fact do that which plaintiffs claim it alone was able to do. It authorized binding arbitration by a majority vote, and it did so knowing the single fact that was material—namely, that an arbitration of the wage and rules dispute with the B&M was about to begin pursuant to the UTU President's acceptance of the NMB's proffer of arbitration and the signing of the Agreement to Arbitrate by Mr. Lyden and Mr. Carbone. I note that while much has been made by plaintiffs of the

fact that the General Committee was contacted only after the Agreement to Arbitrate had been signed, the arbitration hearings themselves did not begin until more than a week after the mailing of the April 30 letter. And despite Mr. Lenfest's claims that he had been "left in the dark" as a General Committee member about the circumstances surrounding the acceptance of arbitration, another General Committee member testified at trial that his files reveal that he continued to receive copies of all relevant correspondence from Mr. Carbone during the relevant time period (November 1979—April 1980). *See* testimony of Richard Gamelin, Trial Transcript at (6) 157–65; and Defendants' Exhibits J–N.

Since no evidence was introduced which would undermine the defendants' theory of ratification,[2] such as the existence of other material facts of which the members of the General Committee were unaware when they marked these ballots, I rule that a jury could not reasonably ignore the undisputed documentary evidence before it and find that the ratification did not take place.

Since the plaintiffs have not presented evidence sufficient to justify a finding in their favor with respect to Count 1, I rule that the defendants' motions for directed verdicts should be granted with respect to Count 1 for all the above reasons.

**2.** Mr. Lenfest did testify that Mr. Carbone did not give any indication in his letter (Plaintiffs' Exhibit 30) that he was seeking a ratification vote on the Agreement to Arbitrate (Trial Transcript at (2) 51); Mr. Lenfest also stated that he did not understand the letter and the attached form (Plaintiffs' Exhibit 31) to be a "ballot" for ratification purposes. (Trial Transcript at (2) 63). Ratification, however, is a *legal* term; whether or not an act has been ratified is a conclusion of law which can be determined only after the relevant facts have been established. Here, the crucial fact determination is whether or not the members of the General Committee were aware of the fact that the dispute had been passed into arbitration by the International at the time they filled out and returned the forms to Mr. Carbone. Only two members of the General Committee who returned this ballot testified at trial, and both testified that they were aware of the issues which had been put to binding arbitration. (Trial Transcript at (3) 139 [testimony of Roger Lenfest]; (6) 163–64 [testimony of Richard Gamelin] ). In order to overcome the docu-

### Counts 4, 5 and 6

Count 4 of the complaint is alleged against both the UTU and the B&M; Count 5 is alleged against the union alone, and Count 6 is alleged against only the railroad. Since each of these counts is based upon plaintiffs' claim that the union lacked the authority to enter into the Agreement to Arbitrate,[3] I rule that defendants' motions for directed verdicts with respect to these counts should be granted.

### Count 3

■ The plaintiffs in Count 3 allege that the UTU breached its duty of fair representation by conducting negotiations with the B&M "with an unauthorized, appointed, non-elected negotiating Committee," by signing the agreement to arbitrate "without authority and without complying with Article 85 and/or Article 80(c) of the UTU Constitution," and by "the denial of the applicability of Article 85 to the Arbitration Agreement." Complaint, ¶ 73.

■ It is well-established that a breach of the duty of fair representation may be found if a union's actions toward its members was "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 380 U.S. 171, 172, 87 S.Ct. 903, 907, 17 L.Ed.2d 842 (1967).

With regard to General Chairman Carbone, plaintiffs' claim that he negotiated

mentary and testimonial evidence which otherwise compels a finding of ratification, plaintiffs needed more evidence than the testimony of Mr. Lenfest to the effect that Mr. Carbone failed to label the form attached to his letter a "ratification ballot." This they did not have.

**3.** Plaintiffs claimed in oral argument on defendants' motion for directed verdicts that even if the union officials were authorized in agreeing to accept binding arbitration, plaintiffs still have a viable claim against the union under Count 5, which articulates a state contract claim for failure of the union to fulfill its obligations to the union members as spelled out in the constitutional contract. Plaintiffs concede, however, that all of the damages they have allegedly suffered stem from the International's acceptance of arbitration. Since the International was wholly authorized in accepting arbitration, as I have ruled, any other alleged breach by union officials of the union's responsibilities to the membership has no relevance to this case.

with the B&M "with an unauthorized, appointed, non-elected negotiating committee" is wholly irrelevant to the damages claimed and remedies sought by plaintiffs, which are related wholly to the union's decision to accept binding arbitration (which was made by the International Union President or his representative) and the resulting award itself. The evidence shows that any negotiating in which Carbone might have engaged with such a Committee took place prior to and was wholly separate from the arbitration proceedings. In fact, General Chairman Carbone's negotiations were aborted when the International Vice President agreed to arbitration and consequently Mr. Carbone's negotiations produced no agreement of any kind which could aggrieve anyone or give rise to any claim of damages by anyone.

Plaintiffs' may argue that Mr. Carbone's "unauthorized" signing of the arbitration agreement amounts to "arbitrary, discriminatory, or bad faith conduct." Even assuming this were the case, no damage would have resulted to the plaintiffs, for Mr. Lyden's clearly authorized signing of that agreement in no manner amounts to conduct violating the *Vaca* standard. It thus would be pointless to submit Mr. Carbone's conduct to the jury under Count 3 particularly where the members of the General Committee ratified his signing by a 15–4 vote as noted above.

I have already ruled that there has been no evidence of bad faith submitted regarding President Hardin and the UTU Board of Director's handling of the question of whether the ratification amendment of Article 85 applied to Mr. Carbone's actions. I further rule that there has been no evidence submitted which tends to establish this conduct as arbitrary or discriminatory toward the plaintiffs. Despite Mr. Lenfest's conclusory opinion that Messrs. McNamara, Chesser, Lyden, and Hardin all acted in "bad faith" and "against the best interests of the union membership" in the actions they took with respect to the acceptance of arbitration (*see* Trial Transcript at (3) 149–52), there has been absolutely no relevant evidence submitted to support this claim. Accordingly, I rule that the union's motion

for a directed verdict on Count 3 should be granted.

*Count 2*

■ Count 2 of the complaint, which is alleged against both the union and the B&M, seeks to have Award 387 impeached on the ground that it "does not conform, nor confine itself to the stipulations of the Agreement to Arbitrate" in three different respects, as required by Section 9 of the RLA, 45 U.S.C. § 159 Third (b).

First, plaintiffs claim that the Award was not filed by the arbitration board within the time limits of ¶ 10 of the Agreement to Arbitrate, which reads:

—shall make and file its award within 45 days from the beginning of the hearings; *Provided*, that the parties may agree at any time upon an extension of this period.

Plaintiffs' argument is either that no agreement was made by the parties extending the time of the filing, or if such an agreement were made, it is invalid, because of Mr. Lyden's lack of authority to represent the General Committee in the arbitration proceedings. Mr. Lyden's authority was fully established at trial, as has been demonstrated above. Since the uncontradicted testimony of Mr. Rice was that an agreement was made by the parties to extend the filing time a "reasonable" amount of time to accommodate the neutral arbiter's work schedule (Trial Transcript at (6) 180, 181), I rule that there is no issue of fact presented here for the jury to find.

Second, plaintiffs' claim that the so-called "moratorium" provision of ¶ F of the Award, which disallows the serving by both parties of RLA Section 6 notices for a period of five years from the date of the issuance of the award, is beyond the scope of the authority of the Arbitration Board because ¶ 4 of the Agreement to Arbitrate, which lists the specific questions which were submitted to the Board for determination, makes no mention of a moratorium provision.

There is no dispute over the fact that the specific areas of the dispute covered by the moratorium provisions (crew size, train lengths, employee protection, and Produc-

tivity Fund payments and special allowances in connection with crew reduction) were all included by the parties in one or more of the Section 6 notices referred to in ¶ 4 of the Agreement to Arbitrate. Plaintiffs' assertion that the moratorium provision is a separate subject of dispute is not supported by any evidence, and is contradicted by the unchallenged testimony of Mr. Rice that moratorium provisions are not common or typical features of original Section 6 notices, but are common and typical provisions of labor dispute settlements. Trial Transcript at (6) 175–76. The evidence shows that the moratorium device was adopted by the Arbitration Board as part of its settlement of disputes that were clearly raised in the parties' Section 6 notices. Since plaintiffs have presented no evidence to rebut this evidence, I rule that there is no basis in fact from which the jury could find for the plaintiffs on this issue.

■ Plaintiffs' third theory under Count 2 is that the moratorium provisions of the Award conflict with ¶ 11 of the Agreement to Arbitrate, which states:

11. The award of the Board shall become effective thirty (30) days from the date on which such award is filed, pursuant to paragraph 12 below, *and shall continue in force subject to the provisions of the Railway Labor Act, as amended.*

(Emphasis added.) While plaintiffs theory here is not at all clear, perhaps they mean to argue that because the RLA in Section 6 allows the parties to a dispute to serve "Section 6 notices" which propose the altering of existing rules, any moratorium provision in an award which temporarily limits the ability of parties to serve Section 6 notices is not in conformance with the provisions of the RLA, namely, Section 6. Such a construction of the RLA was urged on and rejected by the United States Court of Appeals for the Second Circuit in *Seaboard World Airlines, Inc. v. Transport Workers Union of America*, 443 F.2d 437, (2nd Cir. 1971), a decision with which I am wholly in agreement. As the court in *Seaboard* stated, such a construction "would convert an act intended as an instrument for achieving industrial peace into a potent weapon for perpetual warfare." *Id.* at 439.

I therefore reject plaintiffs' argument as a matter of law, and rule that the defendants' motions for directed verdicts with respect to Count 2, as with respect to every other Count, should be granted.

■ In closing I note that the very drastic relief requested by plaintiffs here is for this Court to set aside an Award which has resulted in a net increase of more than $12 million in the wages paid to more than 600 employees of the railroad (including all of the plaintiffs here); this represents a basic 40% increase in wages paid to these employees. *See* Trial Transcript at (6) 197–203 (Testimony of Peter W. Carr). Not one of the plaintiffs in this case has refused to accept the benefits of an Award they now seek to have set aside; all of the checks issued to plaintiffs which represent increased wages for work executed prior to the rendering of the Award have been cashed, and pay-checks containing an increase in wages of about 40% continue to be accepted without protest. These actions on the part of all plaintiffs lead me to conclude that their claims here should be barred under the theory of estoppel and laches. Plaintiffs' claim that the defendants' estoppel and laches theory would have forced them to quit employment by the railroad in order to challenge the Award. Plaintiffs— particularly Mr. Lenfest, who organized this lawsuit—could have easily continued their employment while depositing their increased wages resulting from the Award in escrow pending resolution of their claim. Nothing would have prevented them from returning the raises to the B&M pending resolution of the matter. Because they have not done so and have accepted all the benefits awarded to them by the Arbitration Board, I rule that they are estopped and will not be heard to deny the B&M its benefits under the Award. It is ancient learning that he who seeks equity must first do equity.

Lastly, it should be noted that if the 61 plaintiffs obtained the sought-after equitable relief, *i.e.*, an order setting aside the arbitration award, economic chaos would result. The plaintiffs and the 600 members of their union who have not joined them in this suit would be under an immediate duty

to disgorge and refund to the B&M $12 million they have received and in all probability spent. The wage levels of all of these persons would drop back down to 1977 levels, *i.e.*, a pay cut of about 40%. No contract would be in existence. The B&M would be saddled with larger crews and its past earnings and projected future earnings would have to be recomputed. The only testimony at the trial on this matter was that the B&M would have losses of over $3.5 million for every year 1981 through 1985 instead of the projected profits which now make a reorganization arguably feasible. This loss picture would be the kiss of death to the proposed reorganization, which has been ongoing since 1970, and the kiss of death to 700 jobs, a classic pyrrhic victory!

A summary of the foregoing is not inappropriate at this point. The plaintiffs have sought to set aside the Award and obtain other relief on the basis of six different claims contained in six counts. All counts boil down to one and the same assertion: that the UTU officers who entered into binding arbitration with the B&M were not authorized to do so. Even the denial of fair representation count defines the denial of fair representation as consisting of action by unauthorized officers of the Union.

I rule that as a matter of law plaintiffs' own evidence shows four separate and independent bases for withdrawing their case from the jury (assuming there is a right to jury trial only for purposes of this ruling):

1. The plain language of Article 85 of the Union Constitution expressly authorizes the International President or his representative, when called in to assert a General Chairman as was done here, to be "vested with the same authority held by the General Committee to progress the matter to a conclusion."

2. As noted above, the meaning of the plain language of Article 85 has been interpreted adversely to plaintiffs' position by Union officials empowered by the Union Constitution to make such interpretations.

3. If there is in fact a requirement of General Committee approval of the acceptance of binding arbitration, it was obtained by the ballots General Chairman Carbone mailed out which were returned showing the 15–4 favorable vote of the General Committee members.

4. The plaintiffs are estopped to deny the B&M its benefits under the Award because of the plaintiffs' acceptance of all the benefits accorded them by the Award.

On the basis of the foregoing reasoning, I rule that, assuming that plaintiffs have a right to trial by jury on one or more of the counts in their complaint, they have failed to adduce evidence adequate to create an issue of fact for the jury, and I further rule that defendants have proven that as a matter of law they have a right to directed verdicts and judgments in their favor on the basis of the whole record, primarily on the basis of the written documents supplemented by the uncontradicted testimony.

Order accordingly.