**MAINE CENTRAL RAILROAD COMPANY, and Portland Terminal Company, Plaintiffs,**

v.

**BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES, Defendant.**

**Civ. No. 86–0366 P.**

United States District Court, D. Maine.

June 3, 1987.

426

Richard T. Conway, Shea & Gardner, Washington, D.C., Charles S. Einsiedler, Portland, Me., for plaintiffs.

John O. Clarke, Jr., Highway & Mahoney, Washington, D.C., Craig J. Rancourt, Biddeford, Me., for defendant.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

### I.

On September 30, 1986, Congress ended a long labor dispute[1] between Plaintiffs, Maine Central Railroad Company and Portland Terminal Company (the Railroad), and Defendant Brotherhood of Maintenance of Way Employes (BMWE) by transforming the recommendations of Presidential Emer-

---

**1.** The history of this dispute has been chronicled in the various opinions of this Court and others. *See Railway Labor Executives' Ass'n v. Boston & Maine Corp.,* 808 F.2d 150, 152–56 (1st Cir.), *aff'g in part, rev'g in part,* 639 F.Supp. 1092 (D.Me.1986); *Brotherhood of Maintenance of Way Employees v. Guilford Transp. Indus.,* 803 F.2d 1228, 1229–30 (1st Cir.1986); *Maine Cent. R.R. v. Brotherhood of Maintenance of Way Employes,* 657 F.Supp. 971 (D.Me.1987).

gency Board No. 209 (the Emergency Board) into a binding agreement between the parties. Pub.L. 99–431, 100 Stat. 987 (1986).[2] Congress mandated that if the implementation of these recommendations required the resolution of any unsettled issues, these issues were to be submitted to binding arbitration. *Id.* (3)(A). This arbitration has occurred, and an award was entered on October 30, 1986.

On November 13, 1986, the Railroad challenged the validity of this award by filing the present petition to impeach.[3] The parties have now brought the merits of the petition before the Court on Cross Motions for Summary Judgment.

Congress expressly provided that sections 7 and 9 of the Railway Labor Act, 45 U.S.C. §§ 157, 159 (1982), were to govern both the conduct of the arbitration and the enforceability of the present award, 100 Stat. 987(3)(B), thus giving this Court jurisdiction under 45 U.S.C. § 159 and 28 U.S.C. §§ 1331, 1337. The Railroad has met the jurisdictional requirements of section 9 by filing its petition ten days after the arbitration board filed the award in this Court on November 3, 1986. *See* 45 U.S.C. § 159, Second.

The Railroad has alleged five defects in the arbitration award: Count I, the arbitration board prevented the Railroad from presenting certain evidence; Count II, the board failed to make and failed to file in this Court a transcript of the proceedings; Count III, the board exceeded its authority by setting an excessive rate for *per diem* allowances; Count IV, the board exceeded its authority by including retroactive and lump sum payments as part of the rates of pay to be set by national wage settlement agreements; and Count V, the board exceeded its authority by imposing a two-year moratorium on the arbitrated agreement. The Court finds that there is no genuine issue of material fact as to Counts II, III, IV, and V and, for the reasons articulated *infra,* grants summary judgment for BMWE on these counts. The Court finds, however, that there are genuine issues of material fact as to Count I and therefore denies summary judgment to either party on this count. Before discussing the merits of each count, the Court first considers the statutory restraints upon its review.

### II. *Scope of Judicial Review*

Section 9 of the Railway Labor Act delineates three exclusive grounds upon which the Railroad may impeach the award: one, for failure to comply with the Act; two, for failure to confine the award to the agreement to arbitrate; and three, for fraud. 45 U.S.C. § 159 Third.[4] In addition to these standards, both parties rely in part on the case law that has interpreted the standards for judicial review applicable to section 3 of the Act, although at oral argument BMWE contended that there are subtle distinctions

---

**2.** This Court upheld the constitutionality of Pub.L. 99–431 in *Maine Cent. R.R. v. Brotherhood of Maintenance of Way Employes,* 657 F.Supp. 971 (D.Me.1987).

**3.** The Railroad had also requested that the Court stay the effectiveness of the award pending a decision on the merits of the petition, a request which the Court denied. *Maine Cent. R.R. v. Brotherhood of Maintenance of Way Employes,* 650 F.Supp. 615 (D.Me.1986).

**4.** Section 9 Third provides:

Such petition for the impeachment or contesting of any award so filed shall be entertained by the court only on one or more of the following grounds:

(a) That the award plainly does not conform to the substantive requirements laid down by this chapter for such awards, or that the proceedings were not substantially in conformity with this chapter;

(b) That the award does not conform, nor confine itself, to the stipulations of the agreement to arbitrate; or

(c) That a member of the board of arbitration rendering the award was guilty of fraud or corruption; or that a party to the arbitration practiced fraud or corruption which fraud or corruption affected the result of the arbitration: *Provided, however,* That no court shall entertain any such petition on the ground that an award is invalid for uncertainty; in such case the proper remedy shall be a submission of such award to a reconvened board, or subcommittee thereof, for interpretation, as provided by this chapter: *Provided further,* That an award contested as herein provided shall be construed liberally by the court, with a view to favoring its validity, and that no award shall be set aside for trivial irregularity or clerical error, going only to form and not to substance.

45 U.S.C. § 159 Third (1982).

between the two sections.[5] The Court finds that it may look to the standards articulated in cases decided under section 3 as Congress clearly intended to make the scope of judicial review in section 3 identical to that provided in section 9 despite the more circumscribed language in section 3. *See* S.Rep. No. 1201, 89th Cong. 1st Sess., *reprinted in 1966 U.S.Code Cong. & Admin.News* 2285, 2287 ("The limited grounds for judicial review provided in [the present amendment to section 3] are the same grounds that are provided in section 9 of the Railway Labor Act...."); H.R.Rep. No. 1114, 89th Cong. 1st Sess. 15–16, *reprinted in* Subcomm. on Labor, Comm. on Labor & Public Welfare, U.S. Senate, *Legislative History of the Railway Labor Act, As Amended (1926 through 1966)*, at 1321–22 (1974) (the three tests for judicial review under section 3 are "the tests traditionally applicable to awards of arbitration tribunals, as set out in section 9 of the Railway Labor Act.").

The Railroad has also drawn arguments from the standards applied in cases concerning other types of arbitrations. Although the express language of section 9 might be interpreted as requiring a narrower review than is permitted under these more generalized standards, the Court accepts this additional case law in light of the weight of authority that has disclaimed any distinctions among the various statutory provisions and common law principles. *See, e.g., Brotherhood of Locomotive Eng'r v. Atchison, T. & S.F. Ry.*, 768 F.2d 914, 921 (7th Cir.1985) (drawing analogy between section 3 of the Railway Labor Act and the inquiry necessary to set aside arbitration awards in industries subject to section 301 of the Taft-Hartley Act, 29

U.S.C. § 185 (1982), and section 10 of the United States Arbitration Act, 9 U.S.C. § 10(d) (1982)); *Loveless v. Eastern Air Lines*, 681 F.2d 1272, 1276 (11th Cir.1982) (finding the aforementioned sections to be codifications of the basic principles governing the finality of arbitration); *accord Gunther v. San Diego & A.E. Ry.*, 382 U.S. 257, 261, 263 (1965) (upholding, under section 3 of the Railway Labor Act, arbitrators' interpretation of collective bargaining agreement that was not "wholly baseless and completely without reason" and finding that the decisions of section 3 boards have "the same finality that a decision of arbitrators would have."); S.Rep. No. 1201, *supra*, at 2287 (noting that courts would retain the power under the amended version of section 3 to set aside awards that are "actually and indisputedly without foundation in reason or fact"). *See generally* Annot., 9 A.L.R.Fed. 533 (1971).

This scope of review is considered "among the narrowest known to the law." *Union Pacific R.R. v. Sheehan*, 439 U.S. 89, 91, 99 S.Ct. 399, 401, 58 L.Ed.2d 354 (1978), *reh'g denied*, 439 U.S. 1135, 99 S.Ct. 1060, 59 L.Ed.2d 98 (1979) (describing the restrictions under section 3); *accord Myron v. Consolidated Rail Corp.*, 752 F.2d 50, 52 (2d Cir.1985); *Denver & Rio Grande Western R.R. v. Blackett*, 538 F.2d 291, 293 (10th Cir.1976). Judge Posner has suggested that

[p]erhaps "review" is a misnomer. The district court ... does not review the correctness of the arbitration award, even under a highly deferential standard, such as "clearly erroneous" or "clear abuse of discretion." All it asks ... is whether the arbitrators did the job they

---

5. The pertinent provisions of section 3 regarding judicial review of decisions of National Railroad Adjustment Board provide:

The district courts are empowered ... to make such order and enter such judgment ... as may be appropriate to enforce or set aside the order of the division of the Adjustment Board: *Provided, however,* That such order may not be set aside except for failure of the division to comply with the requirements of this chapter, for failure of the order to conform, or confine itself, to matters within the scope of the division's jurisdiction, or for

fraud or corruption by a member of the division making the order.
45 U.S.C. § 153 First (p) (1982). *See also id.* First (q) (same grounds).

Although the Railroad argues, with respect to the conduct of arbitration, that the rules established to arbitrate disputes under section 3 do not control the proceeding under section 9, Memorandum in Support of Plaintiffs' Motion for Summary Judgment at 27–28, it does not dispute that the standard of review is similar under both section 3 and section 9.

were told to do—not whether they did it well, or correctly, or reasonably, but simply whether they did it.

*Brotherhood of Locomotive Eng'r,* 768 F.2d at 921.

This Circuit, however, has developed its own standards for determining the validity of labor arbitration awards. *Local 1445, United Food & Commercial Workers Int'l Union v. Stop & Shop Co.,* 776 F.2d 19, 21 (1st Cir.1985). Although some of these standards are identical to those provided under section 9 of the Railway Labor Act, *see Courier-Citizen Co. v. Boston Electrotypers Union,* 702 F.2d 273, 281 (1st Cir. 1983) (arbitrators cannot resolve issues not submitted to them), others do not necessarily accord the arbitration process the same degree of deference as might be implied from Judge Posner's description.

■ For instance, courts in this Circuit may vacate an arbitration award if the arbitrators make manifest errors of law, *Bettencourt v. Boston Edison Co.,* 560 F.2d 1045, 1049 (1st Cir.1977), or gross errors of fact, *International Brotherhood of Firemen & Oilers v. Great Northern Paper Co.,* 765 F.2d 295, 296 (1st Cir.1985). *Contra Brotherhood of Locomotive Eng'r,* 768 F.2d at 922 (criticizing those courts that have blurred the distinction between gross errors and *ultra vires* acts). A manifest error is one that is " 'unfounded in reason and fact', [or] is based on reasoning 'so palpably faulty that no judge, or group of judges, could ever conceivably have made such a ruling', or is mistakenly based on a crucial assumption which is 'concededly a non-fact.' " *Bettencourt,* 560 F.2d at 1050 (citations omitted). This type of error may occur if the arbitrators undertake to disregard or modify the unambiguous provisions of the underlying collective bargaining agreement, *S.D. Warren Co. v. United Paperworkers' Int'l Union,* 815 F.2d 178 (1st Cir.1987); *Hoteles Condado Beach v. Union de Tronquistas,* 763 F.2d 34, 41–42 (1st Cir.1985), or to impose a remedy that is neither customary in arbitration awards nor provided for by the agreement, *Bacardi Corp. v. Congreso de Uniones Industriales,* 692 F.2d 210, 214 (1st Cir.1982); *cf.*

*Courier-Citizen* 702 F.2d at 281 (a remedy not expressly stated in the submission but widely and commonly employed by arbitrators is "within the contemplation of the parties") (dicta). Although the question of whether the Circuit would apply its own standards to an arbitration conducted under section 9 of the Railway Labor Act is a question of first impression, the Court finds that these standards are alternative expressions of the "wholly baseless and completely without reason" standard articulated in *Gunther* and thus considers the above cases to be binding authority. *Cf. Keay v. Eastern Air Lines,* 440 F.2d 667 (1st Cir.1971) (affirming section 3 arbitration without discussing general labor law arbitration standards).

Turning now to the issues before it, the Court notes that the five defects alleged by the Railroad all fall within two of the exclusive grounds for impeachment provided by section 9. The first three support a claim that the award exceeds the scope of the congressionally imposed mandate to arbitrate, a violation of section 9 Third (b). The last two support a claim of a failure by the board to conform the proceedings to the provisions of section 7 of the Act, a violation of section 9 Third (a). Keeping the limited scope of its task foremost in mind and with a view toward favoring the validity of the award as mandated by section 9 Third (c), the Court addresses each allegation in the order presented by the parties.

III. *Failure of Award to Conform or Confine Itself to the Stipulations of the Agreement to Arbitrate*

It is common ground that an arbitrator may decide only those questions posed in the submission agreement of the parties. *Courier-Citizen,* 702 F.2d at 281. Similarly, in deciding the issues submitted, the arbitrator must oftentimes interpret the underlying collective bargaining agreement. *See Peerless Pressed Metal Corp. v. Int'l Union of Elec., Radio & Mach. Workers,* 451 F.2d 19, 20–21 (1st Cir.1971) (per curiam), *cert. denied,* 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973); *see also Brotherhood of Locomotive Eng'r,* 768

F.2d at 922. In the instant case, Public Law 99–431 supplants the submission agreement. *Brotherhood of Locomotive Firemen v. Chicago, B. & Q. R.R.*, 225 F.Supp. 11, 18 (D.D.C.), *aff'd*, 331 F.2d 1020 (D.C.Cir.1964) (per curiam); *accord Division 700, Brotherhood of Locomotive Eng'r v. National Ry. Labor Arbitration Bd. No. 282*, 224 F.Supp. 366, 368 (D.D.C. 1963). In addition, Public Law 99–431 has had the effect of transforming the Report to the President of Emergency Board No. 209 (Report No. 209) into part of the underlying collective bargaining agreement between the parties. 100 Stat. 987(2) (Report No. 209 "shall be binding on the parties and shall have the same effect as though arrived at by agreement of the parties....").

The Railroad's three allegations regarding the permissible scope of this arbitration all rely on a literal reading of Report No. 209. The Railroad's reliance is, however, misplaced. It is well settled that although Report No. 209 has become a contract between the parties, "it is to be more liberally construed than an agreement between private individuals." *Peerless Pressed Metal*, 451 F.2d at 20. Absent exceptional circumstances, the arbitrators' interpretation of Report No. 209 is binding on the parties because, in this instance, it is this interpretation that was intended by Congress. *Cf. Hoteles Condado Beach*, 763 F.2d at 41 ("Absent exceptional circumstances, an arbitrator's interpretation of the collective bargaining agreement is final and binding on the parties because it is this interpretation that is bargained for by the parties.") (citations omitted). Although the arbitrators were not permitted to disregard the plain and unambiguous provisions of either Public Law No. 99–431 or Report No. 209, they nevertheless had "great latitude in construing ambiguous language." *Id.* In addition, they were free to look to the circumstances from which both arose. *Cf. Peerless Pressed Metal*, 451 F.2d at 21 ("the arbitrator may look to the 'law of the shop' and to the negotiations which led to the present agreement"). Among the permissible considerations is the aim or purpose of both the recommendations and the

congressional action. *Cf. Brotherhood of R.R. Trainmen v. Central of Georgia Ry.*, 415 F.2d 403, 412 (5th Cir.1969), *cert. denied*, 396 U.S. 1008, 90 S.Ct. 564, 24 L.Ed.2d 500 (1970). The Railroad has weakened its arguments by failing to acknowledge these settled principles.

### A. *The Two-Year Moratorium (Count V)*

The Railroad's argument regarding the moratorium is simple and straightforward: the moratorium issue was not an issue submitted to the arbitration board for decision because Report No. 209 never mentions a moratorium. The Railroad therefore contends that any decision regarding a moratorium was *ultra vires*, citing *Courier-Citizen, supra.* In the alternative, the Railroad argues that any moratorium that might be implied from the language of Report No. 209 is far narrower than the moratorium actually imposed and therefore is similarly *ultra vires*. This artful phrasing of the issue, however, misconstrues the function of a moratorium in the present award.

The Court finds that the moratorium does not represent an issue that was required to be included in the submission agreement. Instead, the moratorium is merely a remedy that may or may not have been within the arbitration board's powers. The Court concludes that in this instance the board acted within its discretionary powers.

It is well settled that an arbitrator may not impose a remedy that is expressly precluded by the agreement or the submission. F. Elkouri & E. Elkouri, *How Arbitration Works* 286 (4th ed.1985) (hereafter Elkouri & Elkouri). It is clear that neither Public Law 99–431 nor Report No. 209 expressly precludes a moratorium of the scope imposed by the arbitrators. The Railroad's point is, however, that neither document expressly authorizes such a moratorium.

The absence of express authorization is not controlling. The test is whether the arbitrators drew their award from the *essence* of the agreement, which may be determined from many sources other than the

agreement itself. *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). In the present case, the arbitrators drew their award from five such sources: Report No. 209, the legislative history of Public Law 99–431, the long history of the dispute, the customary use of moratoriums, and the need to uphold the integrity of the settlement itself.

Recommendation No. Three of Report No. 209 imposes upon the parties the results of the national negotiations regarding rates of pay and health and welfare programs. The arbitrators noted that the national agreement on these issues contains a moratorium and concluded that this moratorium was within the contemplation of the Emergency Board. Award at 31.

In addition, the arbitrators reviewed both the history of the dispute and the legislative history of Public Law 99–431 and concluded that "[t]here is a dire necessity that there be an end to this dispute in order to generate a period of tranquility for all concerned (the parties) and for the matters in the dispute." *Id.* The arbitrators also noted that "the seasoned, knowledgeable, and qualified public members of Presidential Emergency Board 209 were well aware that moratoriums have been part of national settlements for many, many years." *Id.* at 32.

Finally, the arbitrators looked to Recommendation No. Four which provides that the parties may "handle changes in *work rules and practices* contained in notices which had been served *prior* to Executive Order 12557 under the orderly and peaceful procedures of the Railway Labor Act, as amended, up to and including mediation, and without resort to self-help." (Emphasis added.) The arbitrators concluded that "[t]he absence of a moratorium provision would render moot the terms of Recommendation No. 4." *Id.*

The Railroad concedes that Recommendation No. Four "provided for a moratorium on work rules issues not resolved by the Emergency Board." It argues, however, that this moratorium is "explicitly limited ... to issues raised in section 6 notices served *before* the date of Executive Order 12557." Plaintiffs' Memorandum at 15. It argues that because both the Emergency Board and the Congressional Advisory Committee refused to address the issues raised in its May 24, 1986 section 6 notices, it was the intent of both the Emergency Board and Congress that these notices progress under the established procedures of the Railway Labor Act.

The arbitrators explicitly rejected this line of reasoning, a rejection which the Court finds is more than adequately supported by the record. The only clear intent expressed by the Emergency Board is that it refused to allow the Railroad to place new issues in dispute after the President acted on May 17, 1986. To the extent that the May 24, 1986 section 6 notices concern issues already in dispute, the record is devoid of any expressed intention to allow the Railroad to pursue these issues anew once the current dispute was settled.[6]

---

**6.** At oral argument, the Railroad stressed one sentence from the legislative history of Public Law 99–431 which the Railroad argued is evidence of an intent on the part of Congress to allow the Railroad's May 24, 1986 section 6 notices to proceed without the impediment of a moratorium. *See* Cong.Advisory Bd., 99th Cong., 2d sess., *Report Concerning the Progress of Negotiations in a Labor Dispute Between the Maine Central Railroad Company and the Portland Terminal Company, and the Brotherhood of Maintenance of Way Employes* 31 (1986) ("[The Railroad's] May 24, 1986 notice to the BMWE now has been placed in mediation before the NMB and should be handled to a conclusion under established [Railway Labor Act] procedures."). The Court finds that this argument fails for three reasons. First, the sentence relied upon by the Railroad, when read in context, does not necessarily impart the meaning that the Railroad would attach to it. Second, the opinions of the members of the advisory board, all of whom were appointed by the National Mediation Board, are not the equivalent of the opinions of the Congress that enacted Public Law 99–431. Finally, and most importantly, it fell to the arbitrators in the first instance to interpret Report No. 209 in light of the subsequent legislative history. The record reveals that the arbitrators fully considered this issue; their interpretation does not disregard any unambiguous provisions of Report No. 209. Consequently, this Court has no authority to overturn the arbitrators' seasoned judgment regarding this issue.

Consequently, the Court concludes that the moratorium is drawn from the essence of Public Law 99–431. The history of this dispute reveals one central concern of Congress: the necessity of ending the current dispute between the parties. Although the Court need not agree with the remedy imposed in order to uphold the award, *see Local 1445, United Food,* 776 F.2d at 22, in this instance the Court is in full agreement with the arbitrators. This dispute has now involved the highest branches of our tripartite government: twice entering the halls of Congress, once requiring action by the President, and recently involving the Supreme Court. *See Burlington Northern R.R. v. Brotherhood of Maintenance of Way Employes,* —— U.S. ——, 107 S.Ct. 1841, 95 L.Ed.2d 381, 55 U.S.L.W. 4576 (1987). For this Court to allow the parties, given their inability to resolve their differences over the past three years, to begin the process anew once a final settlement has been imposed upon them would be to emasculate the settlement agreement and to denigrate the massive efforts of all those involved in its implementation. *Cf. Sun Oil Co. v. Local 8–901, Oil, Chem. & Atomic Workers' Int'l Union,* 421 F.Supp. 1376, 1384 (E.D. Pa.1976) (upholding award imposing remedy that prevented emasculation of one provision of the collective bargaining agreement).

In some circuits, the arbitrators' reliance on the essence of the agreement, absent an express preclusion of the remedy granted, is enough to bring a given remedy within the arbitrators' powers. *E.g., Local 369, Bakery & Confectionary Workers Int'l Union v. Cotton Baking Co.,* 514 F.2d 1235, 1237–38 (5th Cir.1975), *cert. denied,* 423 U.S. 1055, 96 S.Ct. 786, 46 L.Ed.2d 644 (1976). The test in this Circuit, however, is whether the remedy is "widely and commonly employed by arbitrators" and thus "within the contemplation of the parties." *Courier-Citizen,* 702 F.2d at 281. *See also Bacardi,* 692 F.2d at 214; Elkouri & Elkouri, *supra,* at 287 ("If a given type of remedy has been widely used by arbitrators, an exceedingly strong case may be made in support of an arbitrator's right to use the remedy...."). Thus, the question for this Court is whether moratoriums are widely and commonly used in the settlement of railway labor disputes.

BMWE avers that moratorium provisions are very common in the rail industry. In response, the Railroad contends that this question raises a genuine issue of material fact precluding summary judgment at this time. In light of the facts conceded by the Railroad, the Court disagrees.

One affidavit filed by the Railroad states: "Many collective bargaining agreements in the railroad industry contain moratorium provisions, but many of them do not." Supplemental Affidavit of Bradley L. Peters ¶ 8, at 3. The Court concludes that this affidavit renders the issue one as to which there is no genuine dispute. Although the parties have cited no case law on this point and Court has discovered little through its own efforts, the Court believes that a "widely and commonly used" remedy is one that is not novel, exemplary or punitive, or one that would not subject the parties to "well-founded surprise." Elkouri & Elkouri, *supra,* at 289. *See also Bacardi,* 692 F.2d at 214 (punitive damages); *Courier-Citizen,* 702 F.2d at 282 (unfair surprise). Thus the conceded fact that *many* agreements in the railroad industry contain moratorium provisions can only be interpreted to mean that moratoriums are indeed widely used.[7]

---

7. Another district court has also concluded that moratoriums covering issues submitted to a railway arbitration board are merely permissible remedies, not separate issues in and of themselves. *Lenfest v. Boston & Maine Corp.,* 537 F.Supp. 324, 337 (D.Mass.1982). Although the issue in *Lenfest* was identical to the issue presented here, the relative positions of the parties were reversed: there, the railroad was seeking to uphold a moratorium that prevented the union from filing new section 6 notices. The district court found that moratoriums "are common and typical provisions of [railroad] labor dispute settlements" although they are rarely included in the arbitration submissions. *Id.*

It has also not escaped the Court's notice, although it is not the basis for the Court's decision, that the district court in *Lenfest* reached its conclusions based on the unchallenged testimony of B.E. Rice, Jr., then Vice President for Labor Relations of Boston & Maine Corp. Mr.

Finally, the Court infers from *In re Penn Central Transportation Company*, 347 F.Supp. 1356, 1360 (E.D.Pa.1972), that at least one of the small number of the prior settlements mandated by Congress in the railway industry, Arbitration Award No. 282, was imposed with a similar two-year moratorium. Consequently, the Court finds that there is no genuine issue of material fact regarding whether a moratorium was within the contemplation of the Emergency Board or Congress and that the moratorium imposed in this case was within the arbitrators' powers.

### B. *Per Diem Allowances (Count III)*

The Railroad argues that the arbitration board exceeded its authority by ignoring Recommendation No. Two of Emergency Board No. 209 regarding *per diem* allowances. The Railroad interprets this Recommendation to mandate that the *per diem* at issue must be similar to that provided for in the present agreement between BMWE and the Boston & Maine Corp. The Railroad's interpretation is based entirely on its narrow reading of Report No. 209.

Report No. 209 mentions *per diem* allowances only fleetingly in its discussion of system production maintenance crews.[8] The Emergency Board's overall recommen-

dation was: "The parties should negotiate a comprehensive agreement for System Production Maintenance Crews ... similar to those agreements negotiated on the Boston [ & ] Maine and the Delaware & Hudson rail lines of the Guilford System." Report No. 209, at 22. With regard to *per diem* allowances, the Emergency Board indicated that the "agreement should also contain an appropriate per diem allowance.... The allowance should not be less than that which is currently paid to maintenance of way employees under other agreements or arrangements throughout the Guilford System." *Id.* at 21.

The Railroad interprets these three sentences to mean that the arbitrated *per diem* allowances must be similar to the *per diem* allowances that are paid to other system production maintenance crews in the Guilford System. It argues that since Boston & Maine Corp. is the only entity in the Guilford System with system production crews that had an agreement in place when the Emergency Board met, the arbitrated *per diem* allowance must be similar to the *per diem* allowance in the Boston & Maine agreement.[9] The gravamen of the Railroad's complaint is that any *per diem* allowance that is not similar to the Boston & Maine allowance is *ultra vires*.[10]

---

Rice is currently Vice President-Human Resources for Boston & Maine Corp., Delaware & Hudson Railway, and Plaintiffs Maine Central Railroad and Portland Terminal Company. Second Supplemental Affidavit of Byron E. Rice, Jr. ¶ 1, at 1. In addition, Mr. Rice was an active participant on behalf of Plaintiffs before Emergency Board No. 209. In light of these circumstances, it cannot be argued that the moratorium in this case was not within the contemplation of the parties, and indeed the Railroad has not made that argument in this Court as it is the contemplation of the Emergency Board and not the parties that is controlling in this instance.

8. The Railroad's demand for system production maintenance crews was one of the two major issues in the underlying dispute; the other was BMWE's demand for job protection. The Railroad advocated system production crews in order to streamline its workforce by eliminating BMWE's separate seniority districts. The Emergency Board found that the Railroad should be allowed to implement system production maintenance crews but only if BMWE workers were given job protections in the form of protection payments if they were terminated.

9. In fact, the Boston & Maine *per diem* of $12.75 per day and $4.50 per weekend trip is precisely what the Railroad recommended to the arbitration board.

10. BMWE asserts that the Railroad's "argument is a *factual* one on the merits, which was presented to the expertise of the presiding and neutral arbitrator, and rejected by him." Defendant's Memorandum at 14. Although the Railroad may be attempting to disguise its displeasure with the factual result by attacking the arbitrators' jurisdiction, the Court does not find that the Railroad has presented a factual challenge. On the record before this Court such an attack would have no likelihood of success even if it were permissible. *See supra* Part II. BMWE submitted detailed evidence regarding the *per diem* allowances paid in the Guilford System, the history of those allowances, and the impact of system production maintenance crews on those allowances, a record upon which the arbitrators based their ultimate award. The Railroad, on the other hand, merely presented its *per diem* proposal without justification, concentrating its efforts on seniority issues. *See* Award, Carriers' Statement, Part 2 & Exhibit

The Railroad can prevail on this count only if the arbitrators disregarded or modified the plain and unambiguous provisions of Report No. 209. *Hoteles Condado Beach,* 763 F.2d at 41. The Court finds that they did not. Although the provisions of Report No. 209 might be read to impart the meaning advanced by the Railroad, they do not expressly mandate that interpretation.

■ The Emergency Board recommended that the overall agreement for system production maintenance crews was to be similar to the agreements negotiated on other Guilford lines. The Emergency Board did not say, however, that the *per diem* allowance was to be similar to the *per diems* paid to these same system production crews. Instead, it said that the *per diem* was not to be *less than* that paid to BMWE workers under other agreements *or arrangements* throughout the Guilford system. Taken together, these provisions are ambiguous; their interpretation is left to the discretion of the arbitrators. This discretion is final and binding on the parties unless it is wholly baseless or completely without reason.

Here, the arbitrators construed this language to mean that the *per diem* was "to be not less than the highest per diem appearing in any Maintenance of Way agreement on any of the Guilford rail properties." Award at 19. This construction is not wholly baseless; the Court, therefore, must accept it. Similarly, the Court must accept the arbitrators' calculation of a reasonable *per diem* allowance. The Railroad argues that the arbitrators were precluded from using the 1986 national agreement in making this calculation since the Railroad was not otherwise a party to this agreement. The arbitrators considered this issue fully, and this Court should not invalidate their seasoned judgment regarding the proper method of calculating the allowance. Consequently, the *per diem* allow-

ance mandated in this award withstands this Court's limited scrutiny under section 9 review.

### C. *Rates of Pay (Count IV)*

The Railroad's final argument regarding the arbitration board's failure to confine itself to the submission involves the proper interpretation of three words: "rates of pay." The Railroad argues that "rates of pay" is a term having a narrow meaning that excludes both lump sum payments and retroactive payments. It argues that only the generic term "wages" would include these payments. It points out that Emergency Board No. 209 merely mandated that the parties agree to be bound by the results of the national negotiations involving rates of pay. It concludes, therefore, that Report No. 209 expressly precluded the arbitrators from imposing the results of the national negotiations regarding lump sum and retroactive payments.[11]

The Railroad has presented this Court with no facts that would substantiate a claim that "rates of pay" is an unambiguous term that expressly excludes various other wage provisions. In fact, the Railroad conceded before the arbitration board that "[i]n some agreements, admittedly, 'rates of pay' may be anything agreed to." Carriers' Statement at 17. The Railroad has, however, alleged that it did not intend that "rates of pay" was to include retroactive and lump sum payments.

BMWE contends that the meaning of the term must be drawn from the past practices of the parties and the industry. Framed in this fashion, the issue would seem to present a factual issue as to the intent of the Railroad. The Court concludes, however, that the issue is misframed.

■ The issue here is the intent of Emergency Board No. 209 in framing Recommendation No. Three of its Report. It falls to the arbitration board, in the first in-

---

2–A. Thus, under the First Circuit standard, there could be no finding of a gross error of fact on this record.

**11.** The Railroad draws this argument from the express provisions of Recommendation No. Three which provides: "Consistent with the par-

ties' proposals of March 2 and 3, 1986, and in view of their past practice, the parties should agree to be bound by the results of the national negotiations involving rates of pay and health and welfare programs." Report No. 209, at 22.

stance, to interpret the meaning of this Recommendation. In doing so, the arbitrators were free to look to the circumstances from which the Report arose. BMWE avers that the parties argued the issues of retroactive and lump sum payments before the Emergency Board. Affidavit of William E. LaRue ¶ 73, at 25. It also avers that the parties discussed these issues as part of the unresolved implementing issues created by Public Law 99–431, reaching an agreement that the Railroad later disputed. *Id.* ¶¶ 70, 72, at 24–25. *Accord* Award at 8–9. The Railroad counters that any negotiations between the parties are immaterial to the issue of the arbitration board's authority. Plaintiffs' Statement of Disputed Facts ¶ 79, at 11. The Court disagrees. The parties' presentations to the Emergency Board are highly relevant. This is particularly true in this case since the Emergency Board indicated that its report would include only "limited commentary" with respect to issues other than the major issues of job protection and system production maintenance crews. Report No. 209, at 8. Thus, to ascribe a limited meaning to this limited commentary might well destroy the Board's underlying intent. This possibility is supported by an analysis of the Report as a whole. Although Recommendation No. Three speaks in terms of "rates of pay," the Recommendation does indicate that this issue was encompassed in the parties' proposals of March 2 and 3, 1986. In this same Report, the Board summarized the Railroad's proposal as concerning "*Wages* & Health and Welfare." *Id.* at 14 (emphasis added). This summarization directly contradicts the Railroad's argument.

The Railroad presented this argument to the arbitration board, limited to the issue of lump sum payments (retroactive payments were apparently added for the first time in its arguments to this Court). The arbitration board described the argument as having "no point of referral in [the Railroad's] discussion with the BMWE and this Board." Award at 33. The board went on to find that the issue was "without merit. It appears to be a specious argument and one of form, not substance." *Id.* at 35. It concluded that Emergency Board

No. 209 "used 'rates of pay' in the formal sense as that term appears in the [Railway Labor] Act and as it may appear as a subheading in the labor agreement." *Id.* at 36.

The Court concludes that the arbitrators' interpretation of the term "rates of pay" is not clearly unfounded in reason or fact. Consequently, the Court must defer to this interpretation as a matter of law.

IV. *Failure of the Arbitration Board to Conform the Proceedings to the Provisions of Section 7 of the Railway Labor Act*

The Railroad advances two claims based on the alleged failure of the arbitrators to comply with the procedural requirements of section 7 of the Railway Labor Act, 45 U.S.C. § 157. First, the Railroad claims that the arbitrators failed to provide a fair hearing because they refused to allow the Railroad to present critical evidence on a key issue. Second, the Railroad claims that the arbitrators failed to insure that a transcript of the proceedings was made and filed with this Court.

Section 7 Third provides in part:

**(b) Organization of board; procedure.**

The board of arbitration shall organize and select its own chairman and make all necessary rules for conducting its hearings: *Provided, however,* That the board of arbitration shall be bound to give the parties to the controversy a full and fair hearing, which shall include an opportunity to present evidence in support of their claims, and an opportunity to present their case in person, by counsel, or by other representative as they may respectively elect.

. . . .

**(f) Award; disposition of original and copies.**

The board of arbitration shall furnish a certified copy of its award to the respective parties to the controversy, and shall transmit the original, together with the papers and proceedings and a transcript of the evidence taken at the hearings, certified under the hands of at least a majority of the arbitrators, to the clerk

of the district court of the United States for the district wherein the controversy arose or the arbitration is entered into, to be filed in said clerk's office as hereinafter provided. . . .

45 U.S.C. § 157 Third (b), (f). These procedural requirements, however, must be read in light of section 9 of the Act which provides: "[A]n award contested as herein provided shall be construed liberally by the court, with a view to favoring its validity, and that no award shall be set aside for trivial irregularity or clerical error, going only to form and not to substance." *Id.* § 159 Third (c).

### A. *Failure to Provide a Fair Hearing (Count I)*

One of the unresolved implementing issues submitted to the arbitration board was the determination of which BMWE workers would be eligible to receive protective allowances as provided in Recommendation No. One of the Emergency Board's Report.[12] Before the arbitration process commenced, the parties had set the parameters of this determination in the following manner. The Railroad had produced a list of BMWE workers "Working as of March 3, 1986." Carriers' Statement, Exhibit 1–A. BMWE concurred in this list. The Railroad's submission to the arbitration board then challenged the eligibility of eight categories of workers. These categories included thirteen employees. Award at 13–14. BMWE's submission included both the list to which the parties had previously agreed and a separate list of workers who were not "working" on March 3, 1986 because they were sick, on vacation, disabled, or otherwise not on the job site. Statement of BMWE, Exhibits 8, 9. Ten on these workers had not been included in the Railroad's list. Of these ten, the arbitrators found that four fell within a category that made them eligible for protection allowances. This category, "vacationists," was one not previously addressed by the

Railroad. The Railroad's claim concerns these four employees.

The Railroad contends that it sought to present evidence regarding the status of the ten new employees submitted by BMWE but that the neutral arbitrator rejected the evidence as irrelevant because he was not going to determine the eligibility of individual workers. The Railroad argues that if it had been allowed to present its evidence, the arbitrators would have concluded that the four employees were not eligible for protection allowances. The Railroad's evidence regarding these four employees may be summarized as follows: Although all these employees were receiving or eligible to receive vacation pay for March 3, 1986, none of these employees had a job to return to thereafter. Therefore, the Railroad argues that these employees were not "on vacation" in any traditional sense of the term. Instead, they were merely receiving accrued vacation pay after having been terminated. *See* Affidavit of Bradley L. Peters ¶ 9, at 3–4. Thus, although the Railroad apparently concedes that employees "on vacation" on March 3, 1986 would be eligible for protection allowances, it maintains that the four employees found to be protected were not in fact on vacation on that date. In other words, the Railroad argues that the arbitrators mistakenly relied on BMWE's categorization of these employees, a mistake that would not have been made but for the exclusion of the evidence offered by the Railroad.

BMWE counters that the Railroad's argument is one of semantics, disguising a challenge to the merits of the arbitrators' factual findings. BMWE contends that the eligibility of all categories of workers was determined by the arbitrators' answers to two questions which the parties had agreed would resolve all disputes regarding eligibility. One of these questions was:

(b) Does Recommendation No. 1, as set forth in the EB 209 Report, disqualify an employee for job protection when such employee was not working on the

---

**12.** Recommendation No. One provides: "The Carrier's proposal dated March 2, 1986 for job protection for then currently active employees, as subsequently modified and presented to the Organization on March 3, 1986, should be adopted; the protective allowance to be $26,-000." Report No. 209, at 22.

property on March 3, 1986, but was under pay by the Carrier by virtue of payment for vacation, personal leave, suspension, sickness, injury, etc.?

Award at 15.

In BMWE's view, the Railroad seeks "a second bite at the apple, now arguing to this Court that 'on vacation' is not equal to 'receiving or eligible to receive vacation benefits.'" Defendant's Memorandum at 9. BMWE contends that the arbitrator used the standard encompassed in question (b); the Railroad disputes this contention. Plaintiffs' Statement of Disputed Facts ¶ 33, at 4. At oral argument, BMWE also contended that the neutral arbitrator intended that any disputes regarding the eligibility of individual workers would be subject to further arbitration under section 3 of the Railway Labor Act. The Railroad argued, however, that the Court could not resolve the issue regarding the uncertainty of the standard used by the arbitrators unless it were to submit the Award to a reconvened board for clarification under section 9 Third (c), premising its argument on its view that the board could not be reconvened since its statutory authorization had expired.

The Court notes that the Award does not address the Railroad's request to submit additional evidence. Consequently, the Award is also silent regarding the reasoning employed by the arbitrators in rejecting the request. Nevertheless, the Court finds that the Award itself is not uncertain. The plain language of the Award includes an itemization of the individual employees within each category of eligibility. The Court, therefore, concludes that the Award clearly determines the eligibility of the individual workers enumerated. Thus, the issue before the Court is whether the neutral arbitrator erred in refusing to allow the Railroad to present evidence regarding the categorization of these employees.

"The arbitrator is the judge of the admissibility and relevancy of evidence submitted in an arbitration proceeding. The arbitrator is not bound to hear all of the evidence tendered by the parties; however, he must give each of the parties to the dispute an adequate opportunity to present its evidence and arguments." *Hoteles Condado Beach*, 763 F.2d at 39 (citations omitted). A federal court should vacate an award "only if the arbitrator's refusal to hear pertinent and material evidence prejudices the rights of the parties." *Id.* at 40 (relying on the standard under United States Arbitration Act, 9 U.S.C. § 10(c)). Thus, in order to prevail on the merits of its challenge, the Railroad must show: one, that the evidence was relevant; two, that it was material; and three, that it would have affected the outcome of the proceedings.

The Court begins its analysis from the Railroad's contention that the neutral arbitrator rejected the Railroad's evidence as irrelevant. The Court is certainly able to perceive a basis upon which the arbitrator might have legitimately done so. The Court notes that the BMWE submission clearly indicates that two of the now-challenged employees had occupied jobs that were abolished on February 13, 1986. Thus, the arbitrators were presumably aware that these two employees had no job to return to as of March 3, 1986 and were merely drawing accumulated vacation pay. Nevertheless, the arbitrators determined that these two employees were protected. Since evidence that their jobs had been abolished was before the board, it can be inferred that this evidence was irrelevant to the utlimate determination of eligibility.

■ Nevertheless, the Court finds that it should not rely on inference or presumption, however logical, to support the arbitrators' rejection of this evidence. The actual ground of that rejection remains disputed by the parties, and the Court cannot definitively resolve this dispute from either the Award or the other established facts before it. Thus, there is a genuine issue of material fact as to the relevancy and materiality of the evidence which was offered by the Railroad. Consequently, summary judgment is inappropriate at this time.

BMWE also contends that the Railroad waived any objection regarding the admissibility of this evidence by not raising the issue on October 30, 1986 when the arbitrators met to sign the award. The Railroad

counters that the October 30th meeting was not an appropriate time to offer additional evidence and, in any event, it could not have offered this evidence until after the decision was entered and the Railroad discovered that the evidence was indeed relevant.

The Court finds that both of these arguments miss the mark. Nevertheless, any claim of waiver raises genuine issues of material fact that have not been adequately addressed by the parties in the present motions. Although the Railroad conceded at argument that it never made a proffer of this evidence either orally before the arbitrators or in documentary form after the two-day hearing had concluded, a genuine issue exists regarding the reasonableness of the Railroad's reliance on the neutral arbitrator's statement regarding the ground of his decision. Thus, summary judgment based on a finding of waiver is inappropriate at this juncture.

### B. Failure to File a Transcript of the Proceedings (Count II)

The Railroad's final ground for invalidating the Award is based on its assertion that the arbitrators failed to insure that a transcript of the proceedings was both made and filed in this Court as part of the Award. Section 7 of the Railway Labor Act requires the board of arbitration to file a transcript of the evidence taken at the hearings, together with the original of the award and the papers and proceedings, with the clerk of this Court. 45 U.S.C. § 157 Third (f). Nevertheless, the board is also empowered to make all necessary rules for conducting the hearings. *Id.* Third (b). *See supra.* It is undisputed that the Award as filed in this Court does not include a transcript of the hearings that occurred on October 19 and 20.

BMWE has advanced several arguments to defeat the Railroad's claim. First, it asserts that no evidence was presented at the arbitration sessions. Affidavit of William E. LaRue ¶ 45, at 15. Hence it argues that a transcript was not required under the standard articulated in the statute. Second, it asserts that the neutral arbitrator made the following pre-hearing propos-

al: "It is not my intention to transcribe the proceedings. I am tape recording this session for the sole purpose of supplementing my notes." It further asserts that neither party objected to the proposed procedure. *Id.* ¶ 47, at 16. Thus, BMWE argues that the Railroad waived any objection to this procedure under the standard articulated in *Krieter v. Lufthansa German Airlines*, 558 F.2d 966, 968 (9th Cir.1977); *Order of Railway Conductors v. Clinchfield Railroad*, 407 F.2d 985, 988 (6th Cir.), *cert. denied*, 395 U.S. 841, 90 S.Ct. 104, 24 L.Ed.2d 92 (1969).

The Railroad has offered three responses to BMWE's arguments, only two of which are relevant to the Court's decision. First, it contends that even if no evidence were submitted at the hearings, the statute imposes an absolute duty to make a transcript of the hearings. In the Railroad's words: "To hold otherwise would undermine the ability of a party to obtain judicial review of proceedings where evidence is excluded, as has happened here...." Plaintiffs' Memorandum at 27.

The Court finds that this argument is without merit. The plain words of the statute require only that a "transcript of the evidence taken at the hearings" be filed. The Railroad has cited no authority for its unique interpretation of the statutory language. In fact, nothing in the legislative history of section 7 would appear to indicate an intent on the part of Congress to inject a rigid formalism into section 7 proceedings. *See generally Legislative History of the Railway Labor Act, As Amended (1926 through 1966), supra.* Instead, Congress left unaltered the original wording of section 7. which requires only a transcript of the evidence. Although section 7 does require that the papers and proceedings are to be filed with the Court, BMWE has offered an uncontroverted argument that the papers and proceedings are merely the documents that control the creation of the board and the scope of its authority.

Moreover, the Railroad's justification for its position is flawed. Adequate review of excluded evidence may be secured in sever-

al ways. For instance, the arbitration board may address the exclusion in the Award itself. Alternatively, the Award may be resubmitted to the arbitration board for clarification under section 7 Third (c). Either procedure adequately protects the participants from truly groundless decisionmaking on the part of the arbitrators. Consequently, the Court can discern no justification for requiring the degree of formalism advocated by the Railroad.

In its second argument, the Railroad avers that evidence was indeed submitted at the hearings. Affidavit of Byron E. Rice, Jr. ¶ 6, at 3. The Railroad conceded at oral argument, however, that no oral testimony was given at the hearings and that the only evidence submitted therein consisted of documentary evidence. This documentary evidence has been filed in this Court under oath by the arbitration board as required by section 7 Third (f). Consequently, the Court finds that the Award fully complies with the procedural requirements of section 7, thus obviating the need for the Court to address the waiver argument advanced by BMWE.

■ Even if the Court were to find that the absence of a transcript of the proceedings was a violation of the procedural requirements of section 7, the Court finds that this violation is merely one of form and not substance and therefore should not be relied upon by the Court to set aside the Award. 45 U.S.C. § 159 Third (c). The only claim of prejudice raised by the Railroad from the absence of a transcript centers on the Railroad's claim that it was precluded from presenting relevant evidence. As the Court has observed, *supra,* this claim may be fully aired in the absence of a transcript.

### V.

For the reasons discussed fully above, the Court GRANTS Defendant's Motion for Summary Judgment on Counts II, III, IV, and V but DENIES both Plaintiffs' and Defendant's Motion for Summary Judg-

ment on Count I, and it is hereby SO ORDERED.